# Exhibit 1

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 1

1    IN THE UNITED STATES DISTRICT COURT FOR

2        THE MIDDLE DISTRICT OF ALABAMA

3            NORTHERN DIVISION

4

5    DOROTHY MANZY,                    ORIGINAL

6          Plaintiff,

7    vs.                      CIVIL ACTION NO.

8                             2:05-CV-395-ID-SRW

9    MONTGOMERY HOUSING

10   AUTHORITY and LANE BOGGS,

11         Defendants.

12

13          *      *      *      *      *

14

15       DEPOSITION OF DOROTHY MANZY,

16   taken pursuant to notice and stipulation

17   on behalf of the Defendants, in the law

18   offices of Bradley, Arant, Rose & White,

19   401 Adams Avenue, Montgomery, Alabama,

20   before Nicole Paulk, Certified Shorthand

21   Reporter and Notary Public in and for the

22   State of Alabama at Large, on March 17,

23   2006, commencing at 9:56 a.m.

Page 18

1    understand which date you were talking

2    about just then.  When were you

3    terminated?

4    A.    I believe it was August 2004.

5    Q.    Okay.  So does that change your answer

6    about when you received worker's

7    compensation benefits?

8    A.    Yes.

9    Q.    So when did you receive those?

10   A.    August.

11   Q.    I'm sorry.  I said worker's compensation.

12   I meant unemployment compensation

13   benefits.

14   A.    From August 2004 through I guess January

15   2005.

16   Q.    Okay.  And in January 2005 did the

17   benefits run out or did you get a job or

18   what happened?

19   A.    I got a job.

20   Q.    You said you had worked for Gayfers and

21   then you left Gayfers to work for the

22   Montgomery Housing Authority, and then you

23   said that you received unemployment.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 20

1       authority; is that correct?

2   A.  Correct.

3   Q.  And what position did you first start at,

4       at the housing authority?

5   A.  Management assistant.

6   Q.  Do you remember -- I know it's been a long

7       time, but do you remember how you learned

8       about the job?

9   A.  Through city personnel.

10  Q.  City personnel?

11  A.  Yes.

12  Q.  Are you saying the personnel department of

13      the city of Montgomery?

14  A.  Correct.

15  Q.  If you remember, can you tell me sort of

16      the process of how you got hired?  Did you

17      have to take a test or anything like that?

18  A.  No.  I completed an application and was

19      called in for an interview.

20  Q.  Did you interview with Mr. Thompson?

21  A.  Thomas, yes.

22  Q.  Oh, Thomas, okay.  I think I was talking

23      on top of you.  So you did interview with

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 21

1      Mr. Thomas?

2    A.    Yes.

3    Q.    Was that the only interview that you had?

4    A.    Yes.

5    Q.    And then after you were hired, was there

6          an new employee orientation that you went

7          through?

8    A.    Yes.

9    Q.    Do you remember who your supervisor was

10         when you first started as a management

11         assistant?

12   A.    Ms. Annie Huffman.

13   Q.    H --

14   A.    H-U-F-F-M-A-N.

15   Q.    And do you remember what your salary was

16         at the time?

17   A.    12,000 a year.

18   Q.    And then were you ever promoted from

19         management assistant?

20   A.    Yes.

21   Q.    What was the first promotion?

22   A.    Assistant manager.

23   Q.    Do you remember what year that occurred?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 22

1   A.    I can't recall.

2   Q.    Okay.  Let me ask it this way:  Do you

3         remember about how many years you had been

4         there before you got your first promotion?

5   A.    I would say -- I'm not quite sure.  I

6         would say maybe about seven or eight years

7         before I...

8   Q.    So about seven or eight years, but you're

9         not entirely sure?

10  A.    No, I'm not quite sure.

11  Q.    So do you know what your salary was as

12        assistant manager?

13  A.    It was like 20,000.

14  Q.    So when you got promoted to assistant

15        manager, were you still making 12,000 a

16        year as a management assistant or had your

17        salary increased a little?

18  A.    It had increased.

19  Q.    Do you know what it was by the time you

20        got promoted?

21  A.    May have been like 18,000 or something.

22  Q.    And do you remember how long you worked as

23        an assistant manager?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 23

1   A.   I would say maybe five years.  I'm not

2        entirely sure.

3   Q.   When you were a management assistant, were

4        you assigned to a certain community within

5        the housing authority?

6   A.   Yes.

7   Q.   Which community was that?

8   A.   Gibbs Village.

9   Q.   Do you remember who your supervisor was?

10  A.   Ms. Huffman, Annie Huffman.

11  Q.   Oh, I'm sorry, you told me that.  And then

12       when you were promoted to assistant

13       manager, were you still at Gibbs Village?

14  A.   Yes.

15  Q.   And was Ms. Huffman still your supervisor?

16  A.   Yes.

17  Q.   And did you receive another promotion

18       after that, from assistant manager?

19  A.   To manager.

20  Q.   Do you remember when that was?

21  A.   That was in 1994.

22  Q.   Who was your supervisor when you first

23       became a manager?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 24

1   A.    We had an area supervisor.  I believe it
2         was Ms. Tatum, Marva Tatum.
3   Q.    Martha Tatum?
4   A.    Marva, M-A-R-V-A.
5   Q.    Oh, Marva, okay.  What was Ms. Huffman's
6         title?
7   A.    She was a manager.
8   Q.    So when you were promoted to manager, was
9         that still over Gibbs Village?
10  A.    No.
11  Q.    Where was that?
12  A.    Smiley Court.
13  Q.    And did Ms. Huffman remain the manager at
14        Gibbs Village?
15  A.    Yes.
16  Q.    So you moved from being an assistant
17        manager at Gibbs Village to being a
18        manager at Smiley Court; is that right?
19  A.    Yes.  Well, I had been transferred to
20        Cedar Park under Ms. Huffman, so -- Ms.
21        Tatum, and I left from Cedar Park to
22        Smiley Court.
23  Q.    When you were at Cedar Park, were you

Page 25

1        still an assistant manager?

2    A.    Yes.

3    Q.    When you first became a manager, though,

4          you worked at Smiley Court?

5    A.    Yes.

6    Q.    How long were you the manager at Smiley

7          Court?

8    A.    Let's see.  I think from 1994 through -- I

9          finished --

10   Q.    I need you to speak up because she can't

11         hear you.

12   A.    Oh, I'm sorry.  I'm thinking out loud.  I

13         would say four years maybe.

14   Q.    So from approximately 1994 to

15         approximately 1998; does that sound right?

16   A.    Yes.

17   Q.    So when you were a manager of Smiley

18         Court, you reported to Marva Tatum, who

19         was the area supervisor?

20   A.    Yes.

21   Q.    Did you have anybody that worked under you

22         at Smiley Court, anybody that reported to

23         you?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 26

1    A.    Yes.

2    Q.    Who were they?

3    A.    There was a Mr. James Evans.  He's

4          deceased.

5    Q.    I'm sorry, he's deceased?  What was his

6          title?

7    A.    Clerk typist.

8    Q.    Anybody else?

9    A.    Yvonne Payton.

10   Q.    Yvonne who?

11   A.    Payton.

12   Q.    P-A --

13   A.    -- Y-T-O-N.

14   Q.    And what was her title?

15   A.    Assistant manager.

16   Q.    Anybody else?

17   A.    Those are about the only two that I can

18         think of.

19   Q.    Did Ms. Payton work with you the entire

20         time you were at Smiley Court?

21   A.    No.

22   Q.    Do you remember where her employment fell

23         in?  That's a bad question.  Do you

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 27

1    remember how long you had -- well, let me

2    stop that.  Was she the only assistant

3    manager who ever worked for you when you

4    were at Smiley Court?

5    A.    I think there was another girl who came.

6          I cannot recall her name.  Wells.  Her

7          last name was Wells.

8    Q.    She was also an assistant manager?

9    A.    Yes, uh-huh.

10   Q.    So did you always have an assistant

11         manager while you were at Smiley Court?

12   A.    No.

13   Q.    Do you remember the period of time that

14         you did not have an assistant manager?

15   A.    Do you mean the year or for how long?

16   Q.    However you remember it.  If you don't

17         remember the years -- if you remember, for

18         example, there was a year when I didn't

19         have an assistant manager or there was two

20         weeks when I didn't have an assistant

21         manager.

22   A.    There probably was a year when I didn't

23         have one.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 28

1  Q.    So of the approximately four years, you

2         think it was about a year that you didn't

3         have an assistant manager?

4  A.    Yes.

5  Q.    Do you remember, was that year at the

6         beginning of when you became a manager or

7         at the end of when you became a manager?

8  A.    Near the end.

9  Q.    I'm sorry.  I said manager, but I meant

10        assistant manager.  And do you know why

11        you didn't have an assistant manager?

12 A.    I can't recall.  It may have been due to

13        transfers or something, you know, trying

14        to accommodate the other offices.  And I

15        think at the time Mr. Evans was there.

16 Q.    Was Mr. Evans there the whole time that

17        you were a manager?

18 A.    No.

19 Q.    What period of time was he there?

20 A.    Probably a little after I started, then a

21        year after I became the manager there.

22 Q.    So you had been there a year and then he

23        started; is that right?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 29

1    A.    I believe so.

2    Q.    And then was he still there when you left

3          in '98?

4    A.    Yes.

5    Q.    And after Smiley Court, were you the

6          manager of another community?

7    A.    Yes.

8    Q.    Which one was that?

9    A.    Trenholm Court.

10   Q.    Do you remember the years that you were a

11         manager at Trenholm Court?

12   A.    I don't remember the years exactly, but it

13         probably was about two years after I left

14         Smiley.

15   Q.    So it would have been from approximately

16         '98 to approximately 2000?

17   A.    Yes.

18   Q.    Backing up to Smiley Court, how many

19         housing units were at Smiley Court?

20   A.    500.

21   Q.    And how many were at Trenholm?

22   A.    Approximately 400.

23   Q.    Did you have anybody that worked under you

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 31

1              management decision.  I don't know -- I

2              can't recall what it was based on; I just

3              know it was their doing.

4      Q.    So you didn't apply for a transfer?

5      A.    No.

6      Q.    Just one day the management said, Ms.

7              Manzy, we're going to move you from Smiley

8              Court to Trenholm Court?

9      A.    Yes.

10     Q.    Okay.  Do you remember what your salary

11             was when you were -- approximately what

12             your salary was when you were working at

13             Smiley Court?

14     A.    About 20,000.

15     Q.    And by the time you got to Trenholm Court,

16             do you remember what you were making at

17             that point?  That would have been from

18             approximately '98 to 2000.

19     A.    It may have been the late 20s, like 27,

20             28, 29 or something.

21     Q.    Just somewhere in the upper 20s?

22     A.    Uh-huh.  I'm not exactly sure about the

23             salary.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 32

1   Q.    Okay.  Did you transfer from Trenholm

2        Court to another community?

3   A.    Yes.

4   Q.    And where was that?

5   A.    Patterson Court.

6   Q.    Did you have anybody who worked under you

7        at Patterson Court?

8   A.    Yes.

9   Q.    And who was that?

10   A.    Deborah Ahkimei.

11   Q.    Do you know how to spell her last name?

12   A.    It's A-H-K-I-M-E-I.

13   Q.    M-E-I?

14   A.    Yes.

15   Q.    And what was her title?

16   A.    She was assistant manager.

17   Q.    Do you remember the approximate dates that

18        you worked at Patterson Court?

19   A.    That I worked there?

20   Q.    Right.

21   A.    From the time I left Trenholm up until

22        2004, so...

23   Q.    It was approximately 2000 to 2004?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 33

1    A.    Yes, I think so.

2    Q.    So you remember that you worked there

3          about four years; would that be right?

4    A.    I'm not quite sure.  I don't know why I'm

5          thinking I was there maybe two years.

6          Maybe two to four years.

7    Q.    Do you remember, did Ms. Ahkimei, was she

8          there when you first started at Patterson

9          Court?

10   A.    Yes.

11   Q.    Was she there when you left?

12   A.    No.

13   Q.    Do you remember how long she was there?

14   A.    She was there for -- I think she left a

15         year after I left, so...

16   Q.    Left a year what?

17   A.    After I left.  After I was fired, she had

18         been gone at least a year.

19   Q.    Okay.  So by the time you were terminated,

20         she had already been gone for a year?

21   A.    Yes.

22   Q.    Okay.  Do you remember why she left?

23   A.    Mr. McInnish cut staff and he laid her

Page 34

1    off.

2  Q.   So other than -- and I'm sorry if I've

3       already asked you this, but other than Ms.

4       Ahkimei, was there anybody else that

5       worked under you when you were the manager

6       at Patterson Court?

7  A.   No.

8  Q.   No?  So would it be correct that it was

9       your last year there or approximately your

10      last year there that you did not have an

11      assistant manager who worked under you?

12 A.   Yes.

13 Q.   This staff cut that you were talking

14      about, were there other people within the

15      housing authority that you knew that were

16      laid off at about the same time?

17 A.   Yes.

18 Q.   And who were they?

19 A.   I cannot recall their names.  It was

20      several people.  I can't recall their

21      names.

22 Q.   Were they all assistant managers?

23 A.   I'm not for sure.  I'm not for sure.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 35

1    Q.    Do you remember what your salary was when

2          you started working at Patterson Court?

3    A.    I'm not for sure.  I'll just say maybe 37.

4          Maybe 37, something like that.

5    Q.    Do you remember what your salary was by

6          the time you left?

7    A.    39.

8    Q.    What were your responsibilities as a

9          manager at Patterson Court?

10   A.    My responsibility entails the overall

11         operation of the complex; supervising the

12         work of the assistant; collecting rents

13         from the residents; counseling with the

14         residents --

15   Q.    What was the last part?

16   A.    -- counseling with the residents;

17         conducting re-examination; verifying

18         income; preparing reports; conducting yard

19         inspections; house inspections.

20   Q.    Hold on a second.  You said verifying

21         income, and then what was the next thing

22         you said?

23   A.    Conducting yard inspections, apartment

Page 39

1    write-ups do you remember?  How many

2    write-ups do you remember receiving while

3    you were at the housing authority?

4  A.   Okay.  Let's see.  Maybe two.

5  Q.   Do you remember what they were for?

6  A.   The first one was when I -- okay.  I can't

7    remember what it was for.  I can't

8    remember what it was for.

9  Q.   What about the second one?

10  A.   That was when I was dismissed, during the

11    time when I was dismissed.

12  Q.   I'm sorry, what was that?

13  A.   The second one was during the time that I

14    was dismissed.

15  Q.   During the time that you were dismissed,

16    okay.

17  A.   Yeah.

18  Q.   When you were hired by the Montgomery

19    Housing Authority, during your orientation

20    and filling out all the forms for a new

21    hire, did you get a copy of the employee

22    handbook?

23  A.   Yes.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 40

1    Q.    Do you still have the handbook?

2    A.    Yes.

3    Q.    Did you review it before your deposition

4          today?

5    A.    No.

6    Q.    Did you review any documents before your

7          deposition today?

8    A.    Yes.

9    Q.    And what were they?

10   A.    The complaint that was filed and copies of

11         my response to your interrogatories and a

12         calendar that I had.

13   Q.    What kind of calendar?

14   A.    Just a calendar where I made a notation.

15   Q.    Is that the calendar that you gave to me

16         as part of your responses?

17   A.    Yes.

18   Q.    It was a big calendar with just one month

19         on it?

20   A.    Yes.

21   Q.    You said that you received a copy of the

22         employee handbook and that you still had a

23         copy of it.  Did you read it when you were

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 41

1       given a copy of it?

2   A.      Yes.

3   Q.      Did you understand it?

4   A.      Yes.

5   Q.      Let me go back to when we were talking

6           about when you were a manager of Smiley

7           Court.  Who did you report to at that

8           position?  When you were a manager at

9           Smiley Court, do you remember who you

10          reported to?

11  A.      I believe Ms. Marva Tatum was still the

12          area supervisor.

13  Q.      And what about at Trenholm Court?

14  A.      Charlie McCall.

15  Q.      Charlie McCall?

16  A.      Yes.

17  Q.      Was he an area manager?

18  A.      No, he was the director of housing

19          management.

20  Q.      And what about at Patterson Court?

21  A.      Ms. Sledge, Maxine Sledge.

22  Q.      And do you remember her title at the time?

23  A.      I believe it was director of housing

Page 42

1       management.

2    Q.    Did you report to her the whole time that

3          you were the manager for Patterson Court?

4    A.    I'm not sure.  I don't think the whole

5          time, no.

6    Q.    Was there somebody else that you remember

7          reporting to?

8    A.    I can't recall if Mr. McCall was still

9          there or not; that's not why I'm sure.

10   Q.    So did Ms. Sledge replace Mr. McCall?

11   A.    Yes.

12   Q.    So if you weren't reporting to Ms. Sledge,

13         it would have been Mr. McCall?

14   A.    Yes.

15   Q.    When did you first contact an attorney

16         about any claims against the Montgomery

17         Housing Authority?  I'm not asking about

18         what you talked about with your attorney,

19         just was it before you were terminated or

20         after you were terminated?

21   A.    Before I was terminated.

22   Q.    Do you remember what prompted you to

23         contact an attorney?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 43

1   A.    Probably the suspension she gave me.

2   Q.    Ms. Sledge gave you?

3   A.    Yes.

4   Q.    So would it have been around the time of

5         the suspension?

6   A.    I believe.  I'm not sure, but probably so.

7   Q.    And can you tell me just in your own words

8         why it is that you're suing the Montgomery

9         Housing Authority?

10  A.    Because I feel that they have

11        discriminated against me because I'm black

12        as opposed to the white employees.

13  Q.    And can you tell me why it is that you

14        believe you were discriminated against?

15  A.    Because my workload was increased, and I

16        asked for assistance with it and I

17        received none, which created a hostile

18        environment for me.  And the white

19        employees, when their workload was

20        increased and they asked for assistance or

21        for it to be reduced, they received what

22        they asked for; it was reduced or they

23        received assistance with it.

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 44

1    Q.    So you're saying white employees either

2          received an assistant or had their

3          workloads reduced if they asked for it?

4    A.    Correct.

5    Q.    Any other reason that you believe that you

6          were discriminated against?

7    A.    No.

8    Q.    So the way that you feel like you were

9          discriminated against was either by not

10         reducing your workload or not providing

11         you an assistant?

12   A.    No.  I feel that he was being --

13   Q.    Who's "he"?

14   A.    Mr. McInnish, Mickey McInnish, was

15         discriminating against me because he

16         treated me unfairly as opposed to the

17         white employees.

18   Q.    And how did he treat -- that's what I'm

19         asking.  Is it just because he didn't

20         reduce your workload or give you an

21         assistant, or was there some other way

22         that you feel like he treated you

23         unfairly?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 45

1    A.    He created a hostile environment for me.

2    Q.    How?

3    A.    By having me with a heavy workload.  And

4          if my work wasn't up to par or adequate, I

5          received write-ups from my supervisor and

6          my job was threatened.

7    Q.    You got write-ups from Ms. Sledge?

8    A.    Yes.

9    Q.    And then what was the last thing you said?

10   A.    My job was threatened.

11   Q.    Was threatened?

12   A.    Yes.

13   Q.    And explain that to me.  What do you mean

14         by that?

15   A.    It's just that I was told that if I wasn't

16         -- if I couldn't produce, then I would be

17         dismissed.

18   Q.    And who told you that?

19   A.    Basically Ms. Sledge and Mr. McInnish.

20   Q.    Do you remember a specific conversation?

21         The reason I'm asking is you said

22         basically it was those two.  Do you

23         remember a specific conversation with

1      either Ms. Sledge or Mr. McInnish, or is

2      it just through the write-ups that you

3      received?

4  A.  Through conversations with basically both

5      of them.

6  Q.  And they told you if you couldn't produce

7      that you'd be terminated or dismissed?

8  A.  Ms. Sledge specifically told me that and

9      he basically said he told Ms. Sledge to

10     discipline anyone who could not perform

11     their job or dismiss them.

12 Q.  So Mr. McInnish told Ms. Sledge to -- your

13     understanding is that Mr. McInnish told

14     Ms. Sledge to discipline or dismiss anyone

15     who could not perform their job?

16 A.  Yes.

17 Q.  Okay.  Any other ways that you claim you

18     were discriminated against other than what

19     you've just told me?

20 A.  I feel like the policy that they

21     implemented was more harsh towards me

22     because I was black.

23 Q.  Now, which policy are you talking about?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 47

1    A.    The dismissal policy, the reason I was

2          being dismissed was for wantonness and

3          gross negligence.

4    Q.    Let me back up.  How many housing

5          communities are at the Montgomery Housing

6          Authority?

7    A.    I can't recall now.  It may be -- maybe

8          nine.

9    Q.    Do you remember, were you the only black

10         manager of a community?

11   A.    No.

12   Q.    If you can remember, how many black

13         managers were there and how many white

14         managers were there?

15   A.    There was one white manager and all the

16         rest were black.

17   Q.    One white manager?

18   A.    Uh-huh.

19   Q.    Do you remember who that was?

20   A.    Diane Bishop.

21   Q.    Do you remember which community she had?

22   A.    Richardson Terrace.

23   Q.    Richardson Terrace?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 48

1    A.    Yes.

2    Q.    I think you said that -- correct me if I'm

3          wrong -- when you were talking about the

4          policy that MHA implemented against you

5          was more harsh because you were black, are

6          you talking about their dismissal of you

7          -- are you saying that you believe that

8          they dismissed you -- tell me what you're

9          saying.  I don't want to put words in your

10         mouth.  I'm sorry.  I don't mean to

11         confuse you either.

12   A.    I'm saying that the policy that they used

13         to dismiss me is arbitrary and they could

14         not state a specific reason or act that I

15         did that was wantonness or gross

16         negligence.  It was basically, I felt, at

17         their discretion.

18   Q.    Okay.  Do you know of any other black

19         managers that they did the same thing to?

20   A.    I don't know specifics of it.  I know

21         there was another manager who was no

22         longer there, but I don't know the

23         specifics.  I don't know the details of

Page 49

1          her case.

2    Q.    Was she gone by the time you got there?

3    A.    No.

4    Q.    You're just saying she's not there now?

5    A.    Correct.

6    Q.    Do you know her name?

7    A.    Maggie Gardner.

8    Q.    But you don't know any details about why

9          she's no longer working there?

10   A.    No.

11   Q.    Any other African-American employees that

12         you think that the Montgomery Housing

13         Authority treated more harshly?

14   A.    In my opinion, I feel like all the black

15         managers, all the black employees totally.

16   Q.    So is it your testimony that you think

17         Diane Bishop was the only one who wasn't

18         treated harshly?  Because you said all the

19         black managers, and I was just trying to

20         figure out if you meant all the managers

21         of the communities that were

22         African-American.

23   A.    Yes.  Yes.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 50

1    Q.    Why is it that you feel that way?

2    A.    Because our workload was increased; we

3          were not given assistance when we asked

4          for it as opposed to the white employees;

5          the white manager had fewer units than any

6          of the other managers; the employees on

7          Bell Street -- the white employees on Bell

8          Street received assistance with their

9          workload.

10   Q.    When you say on Bell Street, are you

11         talking about --

12   A.    The main office.

13   Q.    -- the main office?  And which white

14         employees at the main office are you

15         talking about?

16   A.    The ones that I can recall is Jill West,

17         Diane Smith -- Deanne Smith -- and Wendy

18         -- I can't recall Wendy's last name.

19   Q.    But you're saying they received assistance

20         when they asked for it?

21   A.    Yes.

22   Q.    Were any of those three people that you

23         just named, were they managers of housing

Page 51

1      authority communities?

2  A.    No.

3  Q.    Do you remember what their jobs were?

4  A.    Jill West was public relations; Deanne was

5         accounting; and Wendy was over Section 8.

6  Q.    Section 8?

7  A.    Uh-huh.

8  Q.    And then talking about Diane Bishop, you

9         said that she had fewer units than any

10        other manager?

11 A.    Yes.

12 Q.    Do you know how many units she had?

13 A.    I'm not certain.  I would say maybe 75 to

14        90.

15 Q.    And you said Richardson Terrace?

16 A.    Yes.

17 Q.    Would 100 be accurate if --

18 A.    It may be.

19 Q.    Okay.  What kind of help did Ms. Bishop

20        have, if you know?

21 A.    I can't recall.  I can't recall exactly.

22 Q.    And then the other managers besides Ms.

23        Bishop, do you know if any of them had

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 53

1   Q.   Okay.  Has anyone ever told you that they

2        believe you were discriminated against?

3   A.   What do you mean?

4   Q.   Have any other employees at the Montgomery

5        Housing Authority ever said, Ms. Manzy, we

6        think you were discriminated against on

7        the basis of your race?

8   A.   No.

9   Q.   When you were terminated, did they say,

10       we're terminating you because of your

11       race?

12  A.   Of course not, no.

13  Q.   We've talked about Ms. Sledge and

14       Mr. McInnish.  Are they the people that

15       you think at the Montgomery Housing

16       Authority discriminated against you, or is

17       it just one of them or both of them or --

18  A.   Just one.

19  Q.   And which one is that?

20  A.   Mr. McInnish.

21  Q.   So it's your testimony that you do not

22       think Ms. Sledge discriminated against

23       you; is that right?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 54

1   A.   I'll say yes.

2   Q.   And I think I asked a bad question, but

3        you're saying yes, she discriminated

4        against you or no, she did not?

5   A.   No, she did not.

6   Q.   Okay.  And what is it exactly that

7        Mr. McInnish did that you think is

8        discrimination?

9   A.   As I stated earlier, he treated me

10       unfairly as to my workload than he did the

11       white employees and their workload.

12  Q.   So it was his decision to make about

13       workload and providing an assistant?

14  A.   Yes.

15  Q.   Okay.  I understand now.  Was it his

16       decision to terminate you?

17  A.   He signed the papers, yes.

18  Q.   Anybody else at the housing authority that

19       you think may have discriminated against

20       you besides Mr. McInnish?

21  A.   No.

22  Q.   Did you ever -- and I think I know what

23       the answer may be, but did you ever

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 56

1    A.    Mr. McInnish.

2    Q.    And then when did you make that complaint?

3    A.    I can't remember the exact date.  I can't

4          remember exact date.

5    Q.    Would it have been around the time of the

6          termination or the suspension?

7    A.    Prior to.

8    Q.    Prior to?

9    A.    It was prior to the termination and

10         suspension.

11   Q.    And do you remember about how long before?

12         Was it weeks or months or --

13   A.    Probably a couple of months before.

14   Q.    Was that something that you did in

15         writing, or did you just talk to him on

16         the phone or in person?

17   A.    I did it in writing.

18   Q.    Just prepared a memo --

19   A.    Yes.

20   Q.    -- or sent an e-mail or -- do you remember

21         what your complaint was or how you said it

22         to him or what you put in the memo?

23   A.    It was in regards to a memo that Ms. -- a

Page 57

1    write-up I think Ms. Sledge had done. And

2    I believe I answered that and in that memo

3    I asked for help and I stated that I was

4    receiving a grave injustice as opposed to

5    the other employees at the housing

6    authority.

7    Q.    So Ms. Sledge had given you a write-up and

8    you were responding to that write-up?

9    A.    Uh-huh.

10   Q.    Any other time that you can remember

11   complaining to anybody that you were being

12   discriminated against because of your

13   race?

14   A.    No.

15   Q.    While you were working for the housing

16   authority as a manager, did you ever try

17   to find another job somewhere?

18   A.    Yes.

19   Q.    Do you remember about when that would have

20   been?

21   A.    I can't recall. It was just at various

22   times.

23   Q.    And why is it that you were looking for a

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 59

```
 1            uncomfortable  at  the  housing  authority?

 2    A.      Yes.

 3    Q.      When  you  were  looking  for  a  position

 4            because  you  felt  uncomfortable,  do  you

 5            remember  the  time  frame  of  that  or  about

 6            when  that  happened?

 7    A.      Probably  during  the  time  when  I  was

 8            feeling  discriminated  against  when  he

 9            increased  our  workload.

10    Q.      Is  there  a  date  that  you  remember  that

11            your  workload  was  increased?   Would  it

12            have  been  when  your  assistant  manager  was

13            laid  off?

14    A.      Yes.

15    Q.      Before  the  assistant  manager  was  laid  off,

16            did  you  have  any  complaints  about  your

17            workload  then,  or  were  you  fine  with  it

18            then?

19    A.      It  was  still  excessive,  but  it  was  --  I

20            had  --  I  was  fine  with  it.

21    Q.      It  was  manageable?

22    A.      It  was  manageable.

23    Q.      So  after  the  assistant  manager  was  laid
```

Page 60

```
 1           off, is that when you started feeling

 2           uncomfortable in your job?

 3    A.     Yes.

 4    Q.     And then was it during that time period

 5           that you remember looking for another

 6           position?

 7    A.     Yes.

 8    Q.     Do you remember where you were looking for

 9           another job?

10    A.     No.

11    Q.     Or what kind of position?

12    A.     I just wanted to get out of there.

13    Q.     Okay.  A few minutes ago we were talking

14           about that you thought Ms. Pickett at

15           Riverside may have had an assistant

16           manager and maybe one of the other units.

17           Did their assistant managers get laid off

18           when yours did?

19    A.     Yes.  Well --

20    Q.     If you remember.

21    A.     I can't remember.  I'm thinking they got

22           laid off but they brought them back or

23           something.
```

Page 61

1   Q.   Do you remember if they brought back the

2       same ones or they rehired assistant

3       managers?

4   A.   They were different people.

5   Q.   Okay.  Did you ever start taking any notes

6       or keeping a diary about your work

7       conditions at the housing authority?

8   A.   Yes, somewhat.

9   Q.   What do you mean, "somewhat"?

10   A.   I mean I made notations of certain

11      incidents, but it wasn't like on a daily

12      basis.

13   Q.   Where did you keep these notations?

14   A.   Just on paper.

15   Q.   Do you still have them?

16   A.   I think everything I have I've given to

17      you.

18   Q.   Because I know you mentioned a calendar

19      that you made some notes on.

20   A.   That calendar that you have, the notation

21      on that calendar.

22   Q.   So are there any others that you have that

23      you have not given to me?

Page 63

1      Other than what we've talked about, is

2      there anything else that you can think of

3      that was designed to harass, humiliate, or

4      frustrate you?

5   A.  One thing, Ms. Sledge, my supervisor, was

6      constantly calling the office --

7   Q.  Calling your office?

8   A.  Yes.

9   Q.  And what kind of phone calls?

10  A.  Sometimes they were very upsetting, about,

11     you know, firing me.

12  Q.  She was threatening to fire you or

13     something?

14  A.  Yes.  Then she was constantly interrupting

15     the work that I was doing by adding on

16     other duties and still wanting the current

17     work done.

18  Q.  Anything else that you can think of?

19  A.  I can't think of anything right now.

20  Q.  When you say constantly calling your

21     office, did she call you every five

22     minutes or did she call you every day

23     or --

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 64

1    A.    Every day, all through the day.

2    Q.    Several times a day?

3    A.    Several times a day.

4    Q.    Was she calling the other managers too or

5          just you?

6    A.    I'm not sure.

7    Q.    Do you think that the only reason she was

8          calling your office was because you're

9          black, or was she just trying to -- or

10         what was the reason?

11   A.    I feel like she was trying to put pressure

12         on me.

13   Q.    What kind of pressure?

14   A.    Work pressure.

15   Q.    Just to increase your workload or to get

16         you to --

17   A.    To increase my workload or to intimidate

18         me, to frustrate me, to harass me.

19   Q.    And earlier you said you didn't think Ms.

20         Sledge had discriminated against you; is

21         that right?  So I'm just trying to figure

22         out -- when you say she was constantly

23         calling your office, are you saying that

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 65

1          she did that just because you're black?

2     A.    I'm saying she was doing it to --

3          basically to harass me by increasing my

4          workload.

5     Q.    Do you think she didn't like you?

6     A.    Yes, she probably didn't.

7     Q.    Probably did not like you?

8     A.    No.

9     Q.    Just so I'm clear on this, in your

10         complaint you said that white employees

11         who were similarly situated were given

12         assistance and were allowed greater

13         latitude in determining their workloads

14         and received the same or higher pay.

15         Which white employees are you talking

16         about there?  Because there was one white

17         manager; right?

18    A.    There was one white manager.

19    Q.    And tell me her name again.

20    A.    Diane Bishop.

21    Q.    And is she one of the ones that you're

22         talking about in the complaint about given

23         greater assistance?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 66

1    A.    Well, yes, or latitude in her work.

2    Q.    And how do you know she was given greater

3          latitude in her work?

4    A.    One thing, she had less units.

5    Q.    Okay.  Any other way?

6    A.    Her complex probably wasn't as complicated

7          as mine was.

8    Q.    Any other ways you can think of?

9    A.    No.

10   Q.    And were there any other white managers or

11         housing community managers that you think

12         were treated differently?

13   A.    She was the only white one -- white

14         manager.

15   Q.    So now moving from those managers to other

16         white employees that you think were

17         similarly situated, who would they be?

18         Well, I don't want you to have to repeat.

19         You said Jill West --

20   A.    Kerry Revell.

21   Q.    Kerry Revell?

22   A.    Uh-huh.

23   Q.    And who was she?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 68

1           Richardson Terrace.

2    Q.     Was she supposed to provide you any kind

3           of assistance?

4    A.     That's what they said, yes.

5    Q.     That's what who said?

6    A.     Ms. Sledge and Mr. McInnish.

7    Q.     But I take it from your answer -- are you

8           saying she did not provide you any

9           assistance?

10   A.     No, not very much.

11   Q.     Do you know what she was supposed to do?

12   A.     They basically said anything that we

13          needed them to do in the office.

14   Q.     So was she supposed to act sort of like an

15          assistant manager?

16   A.     They never made that quite clear.

17   Q.     Okay.  But just -- you said anything that

18          you needed in the office --

19   A.     They never were specific on it.

20   Q.     So they weren't specific about the precise

21          duties but just said, go help Ms. Manzy

22          any way she needs?

23   A.     Uh-huh.

Page 70

1     whole time you were there or part of the

2     time?

3   A.   No.

4   Q.   Was she hired after the assistant director

5     -- or assistant manager was laid off?

6   A.   After they were laid off.

7   Q.   And it was Ms. Revell's job to help you at

8     Patterson Court and then to help the

9     manager at Richardson Terrace also?

10  A.   Yes.

11  Q.   Was there an assistant manager at

12     Richardson Terrace at this time?

13  A.   I'm not sure.  I don't know.  I don't

14     know.

15  Q.   Do you remember who the manager was?

16  A.   Diane Bishop.

17  Q.   Oh, okay.  And that's the white employee

18     that we talked about?

19  A.   Yes.

20  Q.   But you're not sure if she had an

21     assistant manager?

22  A.   I can't remember.

23  Q.   Anything else you can remember that Ms.

Page 71

1           Revell did to help you?

2     A.    That was basically it.  When I asked for

3           additional help, she said that she had her

4           own work to do.

5     Q.    And her name came up when I asked you if

6           there were any similarly situated white

7           employees who got help when they needed

8           it.  Did she ever -- are you just saying

9           that her workload was lighter or she had

10          somebody helping her?

11    A.    She was responsible for two complexes.

12          She complained to Mr. McInnish on October

13          14th in 2003 that she felt that her

14          workload was too heavy; she needed it

15          reduced; she had done the best she can,

16          but now she feel exhausted; and she wanted

17          to know could she just work one community.

18          And he told her consider it done.

19    Q.    That was October of 2003?

20    A.    Yes.

21    Q.    So did she then stop working for Patterson

22          Court or Richardson Terrace or what

23          happened?

Page 72

1    A.    She started working just in Patterson

2          Court.

3    Q.    Any other way that you think she was

4          treated differently than you were other

5          than what you just told me?

6    A.    Her workload was reduced.

7    Q.    Well, you said that she requested that one

8          of the communities be taken away from her?

9    A.    Yes.

10   Q.    So when you say her workload was reduced,

11         you're talking about that or some other

12         way?

13   A.    That, her workload was reduced.

14   Q.    Okay.  Anything else that you can think of

15         with respect to Ms. Revell?

16   A.    Not at the moment.

17   Q.    Okay.  We've talked about Diane Bishop and

18         Ms. Revell.  Any other white employees

19         that you think were treated differently

20         than you?

21   A.    Deanne Smith.

22   Q.    And she's one of the ladies that you

23         mentioned before?

Page 73

1    A.    Uh-huh.

2    Q.    What was her position?

3    A.    It was pertaining to accounting.  I don't

4          know her official title.

5    Q.    And how do you think she was treated

6          differently?

7    A.    She complained about her workload and she

8          was given someone to help her with it.

9    Q.    Let me back up a second.  With Ms. Revell,

10         how do you know she asked Mr. McInnish for

11         help?

12   A.    I heard the conversation.

13   Q.    So you were present?

14   A.    Yes.

15   Q.    Where did it take place?

16   A.    In Patterson Court.

17   Q.    Was anyone else there besides you,

18         Mr. McInnish, and Ms. Revell?

19   A.    No, he wasn't present in the office.

20   Q.    It was a telephone conversation?

21   A.    Yes.

22   Q.    What happened with Richardson Terrace?

23         Did they get a new community worker?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 74

1   A.   Yes.  He assigned it to somebody else, a

2        black guy.

3   Q.   You don't know his name?

4   A.   I think his name is Tony.  I can't think

5        of his last name.

6   Q.   But as far as you know, Ms. Revell went

7        from being the community worker for

8        Patterson Court and Richardson Terrace to

9        Patterson Court only?

10  A.   Yes.

11  Q.   And then somebody named Tony became the

12       community worker for Richardson Terrace?

13  A.   Yes.

14  Q.   Okay.  Now with Deanne Smith, how do you

15       know that she complained and was given

16       help?

17  A.   Well, she -- we received a memo saying

18       that a new person -- I can't think of her

19       name -- would be assisting Deanne.

20  Q.   So it's just like a memo that said,

21       welcome this new employee or something?

22  A.   No.  He was changing something else, and

23       somewhere in the body of it, it said,

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 75

1        such-and-such will now be assisting Deanne

2        in accounting so we can call her too

3        instead of calling Deanne all the time.

4    Q.   All right.  And do you have any

5        information about what kind of workload

6        Ms. Smith had before she got help?

7    A.   She was handling the accounts for the

8        communities.

9    Q.   Have you ever worked with Ms. Smith like

10       in the office or anything?

11   A.   No.

12   Q.   Do you know what she had to do on a daily

13       basis or how much work she had to do on a

14       daily basis?

15   A.   Not exactly.

16   Q.   And then I think you said earlier Jill

17       West?

18   A.   Yes.

19   Q.   What do you know about her workload and

20       stuff like that?

21   A.   From what I can see that she was doing,

22       only thing I saw her doing was putting out

23       a quarterly newsletter.

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 76

1    Q.    And she was the one that you said was in

2          PR?

3    A.    Yes.

4    Q.    And then there came a time when she

5          requested some help of some sort?

6    A.    Yes.

7    Q.    And how did she request that help?

8    A.    Mr. McInnish asked the board in a board

9          meeting for her some help, that her

10         workload had increased and she needed some

11         help.

12   Q.    Were you at the board meeting?

13   A.    Yes.

14   Q.    Do you remember the date of it?

15   A.    I think I gave you a copy of it.  I can't

16         recall the date, but I gave you a copy of

17         it.  It was an agenda.

18   Q.    I'm sorry, what?

19   A.    An agenda.

20   Q.    Oh, agenda, okay.  With Deanne Smith, do

21         you know how it came about that she got

22         this extra help?  Did she ask for it or --

23   A.    I'm not quite sure.  I just know the memo

Page 77

1    came out.

2    Q.    And then with Ms. West, you said that you

3          knew she put out a quarterly newsletter,

4          but do you have any knowledge about what

5          her -- other than that, what her duties

6          are in her job?

7    A.    I know she was to speak to the media

8          whenever there was a need, which wasn't

9          very often.

10   Q.    Have you ever worked in the PR department

11         at the housing authority?

12   A.    No.

13   Q.    Then earlier you said the name of somebody

14         -- you couldn't remember her name, but she

15         worked in Section 8 housing.

16   A.    Wendy.

17   Q.    Wendy, okay.  What do you know about what

18         her daily duties were, her job duties?

19   A.    I know she was responsible for the Section

20         8 office, taking applications, verifying

21         incomes.

22   Q.    Did there come a time when she received an

23         assistant or somebody to help her?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 78

1   A.    Yeah, she had a staff, but it's my

2        understanding that he gave her latitude as

3        to coming in to work late so she could be

4        with her family.

5   Q.    When you say "he," you're talking about

6        Mr. McInnish?

7   A.    Mr. McInnish.

8   Q.    So you think she was treated differently

9        because she got to come in work late?

10   A.    Work half a day.

11   Q.    Oh, she worked half days?

12   A.    Uh-huh.

13   Q.    Do you know anything about how she got

14        paid?

15   A.    It's my understanding she received full

16        pay.

17   Q.    And how did you come to that

18        understanding?  How did you get that

19        information?

20   A.    A conversation I had with Ms. Sledge.

21   Q.    Did you ask Ms. Sledge about it or what

22        happened?  What was that conversation

23        about?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 79

1    A.    I think it generated from when we were

2          talking about me taking time off to take

3          the bar.  And she told me about Wendy

4          coming in or it may be allowed -- or I

5          could work half days because Wendy was

6          allowed to come in half a day.

7    Q.    And Ms. Sledge said that she gets paid her

8          full salary even though she works half a

9          day?

10   A.    That was the impression I got from Ms.

11         Sledge.

12   Q.    And this was during a time when you were

13         going to try to take some time off to

14         study for the bar?

15   A.    Yes.

16   Q.    Do you remember when that was?

17   A.    It may have been like -- may have been May

18         or something of '04.

19   Q.    Did you end up taking any time off to

20         study for the bar or how did that work

21         out?

22   A.    I -- yes, I'm sure I was -- I did take

23         some time off.

Page 80

1   Q.   Do you remember how much time?

2   A.   About three weeks.

3   Q.   Did you get paid for the three weeks?

4   A.   I had to use my annual leave.

5   Q.   And did you have a full three weeks of

6        annual leave, or did there end up being

7        some days that you didn't get paid for or

8        --

9   A.   No.

10  Q.   So you got paid for the full three weeks

11       by using your annual leave?

12  A.   Yes.

13  Q.   Okay.  So we've talked about Ms. Bishop,

14       Ms. Revell, Ms. Smith, Jill West, and the

15       employee named Wendy.  Are there any other

16       employees that you can -- white employees

17       that you think were treated differently

18       than you?

19  A.   No.

20  Q.   And of those people that I just named, Ms.

21       Bishop was the only one that was a housing

22       manager; correct?

23  A.   Yes.

Page 81

1    Q.    You've never worked as a community worker

2          for the housing authority; is that right?

3    A.    No.

4    Q.    And you've never worked in accounting?

5    A.    No.

6    Q.    And never worked in PR?

7    A.    No.

8    Q.    And never worked in Section 8?

9    A.    No.  Well, for a short period of time I

10         worked in Section 8, but that was -- that

11         was a long time ago.

12   Q.    Was that when you first started?

13   A.    When I first started.

14   Q.    What did you do when you worked in Section

15         8 at that time?

16   A.    I think I took applications and filed.

17   Q.    Are there any other black employees that

18         you think were treated the same as you

19         were?

20   A.    Yes, all the managers.

21   Q.    So we've talked about the managers.  And I

22         think earlier you said it's because they

23         didn't have assistant managers and their

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 82

1    workload was high; is that right?

2  A.    Yes.

3  Q.    Okay.  So other than those two ways, are

4        there any other ways you can think of that

5        they were treated differently?

6  A.    No.

7  Q.    But some of those managers did have

8        assistant managers though; right?

9  A.    Yes.

10 Q.    And that was at least the one that was at

11       -- where did you tell me?

12 A.    Riverside.

13 Q.    Riverside.  And then were there others?

14 A.    I believe there were, but I can't recall

15       the communities.

16 Q.    So other than the managers, anybody else

17       that you can think of that would have been

18       treated similarly to the way you were

19       treated?

20 A.    I believe basically all the black

21       employees.

22 Q.    And why do you think that?

23 A.    It's just that most of the whites were in

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

Page 83

1           higher positions.

2    Q.    Any other reason?

3    A.    Most of the white employees were hostile

4          toward the black employees.

5    Q.    I'm sorry, what, now?

6    A.    They were hostile.

7    Q.    White employees were hostile against black

8          employees?

9    A.    Yes.

10   Q.    And how do you mean?

11   A.    It just wasn't friendly, some of them.

12         They spoke to you in harsh tones.

13   Q.    Who are these people?

14   A.    I can't recall all of them.

15   Q.    Can you recall any of them?

16   A.    Rudy Martinez.

17   Q.    Rudy Martinez?

18   A.    Yeah.  I can't think of the lady in

19         accounting.  Lane Boggs.

20   Q.    Lane Boggs?  Are these people who spoke

21         harshly to you?

22   A.    At times.  Just overall that's how they

23         treated the other blacks as well.

Page 84

1   Q.   Were you ever present when you witnessed a

2        white employee being hostile to a black

3        employee?

4   A.   I'm speaking in terms of at meetings.

5   Q.   Like staff meetings and stuff, or --

6   A.   Uh-huh.

7   Q.   Can you give me an example of some time,

8        if you remember?

9   A.   I recall when we were changing over to the

10       new retirement system and some of us were

11       trying to talk to Rudy, he like snapped at

12       us in a harsh tone.  But I can't remember

13       any of the other specifics.

14  Q.   Is there anybody who would have witnessed

15       the way you were treated or any

16       discriminatory conduct toward you?

17  A.   What exactly do you mean?

18  Q.   Was anybody ever present when you were --

19       when somebody was being hostile to you or

20       when somebody told you you couldn't have

21       an assistant or -- I mean, was there

22       anybody who has seen or heard your version

23       of the story, I guess?

Page 86

1          they were for; is that right?

2     A.   No.

3     Q.   Okay.  Do you remember receiving a

4          write-up about -- after a resident

5          complained that they didn't receive

6          adequate notice of a rent increase?

7     A.   Okay.

8     Q.   Does that ring a bell?

9     A.   Uh-huh.

10    Q.   Do you think that's the first one that you

11         received?

12    A.   It may have been.  I can't remember.  I

13         know she did like two or three of them.

14    Q.   Well, for now we'll call it the first one,

15         and if we come across an earlier one,

16         we'll change.  Tell me what you remember

17         about that write-up.

18    A.   I just remember her saying that --

19    Q.   Talking about Ms. Sledge?

20    A.   Ms. Sledge, uh-huh, saying that the lady

21         complained that she didn't get her notice

22         in time.

23    Q.   The resident complained?

Page 87

1   A.    The resident didn't get her notice in time

2        and she was complaining about having to

3        pay her rent.

4   Q.    The resident was complaining?

5   A.    Yes.  But I believe in that incident I may

6        have been on leave.  We didn't have

7        anybody to take our mail, to come and pick

8        up the mail, and I think when it did get

9        to accounting, Deanne still had time to

10       post it to the tenant account and she

11       didn't post it, but I got blamed for it.

12  Q.    Okay.  Well, give me one second.  Let me

13       just look at these pages for a second.

14       Okay.  I'm going to mark this --

15            MS. ROGERS:  Mr. Hurst, unless

16                 you -- I'm going to mark

17                 this as a collective

18                 exhibit.  It's four pages

19                 that I have.

20            MR. HURST:  It's from the

21                 termination hearing?

22            MS. ROGERS:  Right.  It's from

23                 behind Tab Number 1.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 89

1    Q.    -- should have been mailed?  Is that what
2          you're saying?
3    A.    Uh-huh.  And the rent change to go to
4          accounting, I know I had that ready.  I
5          know I had the rent change ready to go to
6          accounting.
7    Q.    Is the rent change a form?
8    A.    It's a form we send over to have a rent
9          changed from the tenant statement.
10   Q.    So you fill that out and you send it to
11         accounting?
12   A.    It was in the tray -- in my tray in the
13         office to go to accounting.  Ms. Sledge
14         didn't send anybody to pick the mail up
15         while I was on leave.  When I got back, I
16         sent it, and it still got to Deanne in
17         time in accounting to be posted to this
18         lady's account so that she would know
19         about her rent.
20   Q.    Just so we're clear for the record, is it
21         the case that residents are supposed to be
22         notified of rent changes so many days in
23         advance?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 90

1    A.    Yes, uh-huh.

2    Q.    Do you remember the days?

3    A.    I guess maybe 30 days in advance.  But it

4          doesn't always work that way because you

5          have to wait for information to come in.

6          Very, very seldom it works that way.

7    Q.    So what you're saying is that you sent it

8          to accounting in time for it to be posted

9          --

10   A.    To her rent receipt.

11   Q.    Are you saying that you sent it to

12         accounting in time for it to be posted so

13         that she would have been notified in the

14         right number of days?  Is that --

15   A.    Well, yes.  It would have been on her

16         account for the first of that month.

17   Q.    And then what happens after you send the

18         rent change form to accounting?

19   A.    The rent gets posted on the account.

20   Q.    Is that something that just gets posted on

21         the computer or something?

22   A.    And a notice gets sent to the tenant --

23         well, on their rent receipt.

Page 92

```
 1          notice that goes with this envelope.  She

 2          received this 2002?  January 10, 2002?

 3          That couldn't be right.  I'm not familiar

 4          with that.

 5     Q.   Let me just see it real quick.  Well, what

 6          was your understanding of what Ms. Price

 7          told -- of her complaint to Ms. Sledge?

 8     A.   It's my understanding that she went in

 9          there maybe the month that her rent was

10          due, around the first or something, and

11          saying that she didn't get notice, I

12          guess, that her rent was going to be due

13          on December the 1st.

14     Q.   Is it your memory that by the time she

15          went in to talk to -- she owed two month's

16          rent already?

17     A.   No.  I'm thinking she just owed the

18          current month's rent, December rent or

19          whatever it was.  It wasn't like two

20          months.  I don't recall that.

21     Q.   Well, if Ms. Price -- if the resident said

22          that it was two months, would you have any

23          reason to dispute that?
```

Page 93

1    A.    Yes.  I don't think it was two months.  I

2          -- I don't know.  I know it got to Deanne

3          in time to be posted to her receipt where

4          she would have known, and had she not been

5          able to pay it at that time, we could have

6          made arrangements with her.  I don't

7          recall it being two months.

8    Q.    Well, if the notice of rent adjustment was

9          dated November the 25th, 2003 --

10   A.    I don't know what that is.  That -- I

11         mean, they could have --

12   Q.    Well, you signed it.

13   A.    I signed it, but I don't know if this goes

14         along with this envelope in here.

15   Q.    Well, if the notice of rent adjustment

16         form was completed by you on November 25,

17         2003, when should it have been mailed to

18         the tenant?

19   A.    On that date when I completed it.  I don't

20         know what this is.  I do know that once I

21         was terminated and suspended, Ms. Sledge

22         and other people went through my office

23         and through files, and so I'm just not

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 94

1      sure of anything that they put together or

2      they put before you all.

3  Q.  I understand what you're saying, but what

4      I'm asking is, if that form is dated

5      November 25, 2003, you would have mailed

6      it that day?

7  A.  During that time, yes.

8  Q.  During that time?  Is there a time that it

9      needs to be mailed by?

10 A.  Yeah, they're supposed to get a notice

11     prior -- I think at least a month notice

12     prior to that.

13 Q.  If there's a rent change, they're supposed

14     to get a month's notice?

15 A.  Uh-huh.  But that's not always the case.

16     I don't have her folder before me.  It

17     depended on when I computed her rent, you

18     know, when I got everything back to

19     complete her rent.  Sometimes we just go

20     on and back date them.

21 Q.  Well, if Ms. Price complained, would you

22     have any reason to think that she wasn't

23     telling the truth?

1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com
1-800-888-DEPO

Page 95

1    A.    I don't think she was telling the truth

2          about two month's rent.  I really don't

3          recall that.  And then these envelopes

4          that Ms. Sledge has here that she received

5          back in '02, I'm not sure of that at all.

6          I don't know where this envelope come

7          from.

8    Q.    Well, the postmark that's on the envelope,

9          that wouldn't be incorrect, would it?

10   A.    No.

11   Q.    And do you remember if Ms. Sledge ever

12         counseled you about this incident, this

13         resident's complaint?

14   A.    I'm thinking that may have been one of the

15         write-ups or something.

16   Q.    Page 3 of this exhibit is an employee

17         counseling record, and in the attachment

18         to that, it describes the complaint by Ms.

19         Price.  So do you admit that Ms. Sledge

20         did counsel you on that, about the

21         complaint?

22   A.    If this is the write-up, yes.  But then

23         where is my response?  I responded to her

Page 96

1           and I told her -- gave her the reason as

2           to why.  It all stated back to my workload

3           being too heavy.

4    Q.     Right.

5    A.     And during the time when I was working on

6           that folder, I was in on a weekend, on a

7           Saturday, trying to get these rents out in

8           time.  But this is just all that I had a

9           heavy workload and I couldn't get

10          everything out in a timely manner.

11   Q.     Okay.  So you're saying that the reason

12          that the envelope would have been mailed

13          late is just because you had an excessive

14          workload?  Or the reason that the notice

15          would have been mailed late?

16   A.     Yes.

17   Q.     Okay.  But you do remember that this was

18          something you were written up for?

19   A.     Yes.  This is the employee counseling

20          record, yes.

21   Q.     And you're not denying that it was mailed

22          late, are you, that Ms. Price's rent

23          change form was mailed late?  Because I

Page 97

1      think you said it had to do with your

2      workload.

3   A.   Yes, it had to do with my workload, and I

4      was in that day working on -- that

5      Saturday working on these folders prior to

6      me taking leave.  But still Ms. Price

7      could have known what her rent was had

8      Deanne posted the correct amount to her

9      receipt, which Deanne had that in her

10     office.  So that goes back to where I feel

11     that I'm being discriminated against

12     because whereas the white employees made a

13     mistake, they were not penalized, but when

14     me as a black employee made a mistake, I

15     got wrote up for it.

16  Q.   Well, if Deanne posted it, what would have

17     happened?

18  A.   Ms. Price would have known what her rent

19     was on December the 1st.

20  Q.   And is that because a form goes out from

21     Deanne to the resident or --

22  A.   It goes out on her rent statement.

23  Q.   So they get a rent statement every month?

Page 99

1   her a 30-day notice.  So I computed her

2   rent when I had all the income

3   verification in.  Those things I can't

4   control.  I could not control that.  You

5   send out the employee verification; the

6   employer may keep it for a while, you

7   know, and then you do follow-up.

8   Q.   But you did have control over what date

9        this form was mailed; right?

10  A.   Not if I couldn't compute the rent.  I

11       computed the rent on that date.

12  Q.   Well, the rent's filled in on this form.

13       It says $84 a month and then for a total

14       of $96 a month.

15  A.   Apparently that was her rent.

16  Q.   So this form should have -- I think I

17       understood you said this form should have

18       been mailed around November 25, 2003, to

19       the tenant?

20  A.   In order for her to get 30 days notice, it

21       probably should have been mailed on

22       November the 1st, but I didn't have all

23       her income verification, so I couldn't do

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 100

1     her rent.

2  Q.    Well, then how did you come up with the

3     numbers that are in here?

4  A.    After I computed the rent on this date,

5     this was the date her rent goes into

6     effect.  So that was on the form, so I

7     knew it goes into effect on December the

8     1st.  After I computed her rent, that told

9     me how much her rent would be.  But

10     according to the regulations, they're

11     going to get 30 days notice.  This should

12     have gone out then, but I didn't have

13     proof of her income to compute it.

14  Q.    But what was the reason it didn't go out

15     until January of 2004?

16  A.    Because of my workload.  I had such a

17     heavy workload, I basically just

18     overlooked it.  And once I discovered it,

19     I still mailed it to her.  But had I known

20     it was going to be held against me -- you

21     know, I still felt that she needed notice

22     of her rent, so I sent it out to her, but

23     I'm saying also she would have had notice

Page 104

1          it's all going to be part of Defendants'

2          Exhibit 4.

3   A.     Okay.

4   Q.     Tell me what you remember about the tenant

5          who called in about the water damage.

6   A.     Okay.  I recall that happening -- I think

7          I had just gotten back from leave again,

8          and that happened the night before I got

9          there, got to work.  The maintenance had

10         gone and cleared out all the water.  The

11         tenant called me maybe about 10 o'clock or

12         9:30.

13  Q.     Is that the morning that you returned from

14         leave?

15  A.     The morning I returned to work.  During

16         that time, we was preparing for an audit

17         with HUD, and we were transferring over to

18         new units on the computer, Visual Home.

19         Okay.  I had notices that we had to have

20         the files in order for HUD inspection and

21         we had to check all our folders for the

22         Visual Home inspection.

23  Q.     What is the Visual Home inspection?

Page 105

1  A.    That was the new computer system, I'm

2        sorry, a new computer system that they

3        were transferring over to.  And we had to

4        go in and check all the tenant data, and

5        we had to pull the file and verify about

6        what they gave us, what the housing

7        authority gave us, and key it into the

8        computer.  That had to be done almost like

9        right away.  That was like top priority,

10       along with checking the folders for HUD,

11       for the HUD inspection.  When this lady

12       called and told me about her damage, the

13       maintenance man had already came in and

14       briefed me on it, told me that they had

15       taken care of all the water or whatever.

16       She called about her damages.  I said

17       okay, I'll be up in a second; hold on to

18       everything, and I'll come up and look at

19       it.  Then I think I got a fax from Ms.

20       Sledge saying to do something differently;

21       she needs it like now, you know --

22  Q.    You mean do something different for that

23       inspection or --

Page 106

1    A.    For HUD.

2    Q.    For the inspection or a different task

3          altogether?

4    A.    For HUD, a different task.

5    Q.    Okay.

6    A.    Okay.  When I got ready, after I finished

7          doing what Ms. Sledge asked me do, I was

8          headed out of my door, and the tenant came

9          in.  And I told her, well, I'm headed up

10         to your house now to inspect your damages.

11         She said, well, that's okay, I've thrown

12         them away.  And she knew not to throw them

13         away because I told her.  And this tenant

14         was -- her personality was the kind that

15         she was always going to try to get more if

16         she could, you know.  I think a couple of

17         times it was something about a check and

18         she wanted more of that, so I somewhat

19         knew her personality.  So I felt like she

20         disposed of the damages on purpose.  I

21         think she took her own pictures, and I

22         didn't get a chance to view the damages

23         because she disposed of them.  But the

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 108

```
1    Q.    And then what is the date of the claim on

2          there?

3    A.    She has on here 6/18/04.

4    Q.    Is "she" the resident?

5    A.    I guess the resident, uh-huh.  I think she

6          filled it out.

7    Q.    And then do you remember when you actually

8          inspected the property?

9    A.    I don't think I got an opportunity to

10         inspect it because she had disposed of her

11         damages.  Let me see.

12   Q.    Is that your handwriting there on the

13         second page of this?

14   A.    Yes.

15   Q.    And then this on the first page is the

16         resident's handwriting?

17   A.    Yes.  So that's why I didn't get a chance

18         to go up to inspect them, because --

19   Q.    Well, you signed it on July the 12th,

20         2004?

21   A.    Uh-huh.

22   Q.    So is that the date that you -- did you

23         ever inspect it, or did you inspect it on
```

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 109

1      the 12th?

2   A.    I didn't have anything to inspect.  And

3         they never gave us a time frame as to when

4         to turn in a claim form.  They never --

5   Q.    "They" being the Montgomery Housing

6         Authority?

7   A.    The Montgomery Housing Authority.  And

8         from all that time up until I signed it, I

9         was busy with their project, the

10        inspection -- not the inspection, the HUD

11        review and the Visual Home.

12  Q.    Okay.  So I'm not sure I got an answer.

13        Did you ever inspect the apartment, or you

14        did not inspect the apartment for water

15        damage?

16  A.    I was supposed to inspect the damages,

17        these things that she listed, and she

18        didn't have any to inspect.  And she

19        brought me the pictures of them.

20  Q.    When did you learn that she didn't have

21        anything to inspect?

22  A.    The same day when she called my office.

23  Q.    To say that there had been water damage?

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 110

1    A.    Uh-huh.

2    Q.    And she brought pictures in?

3    A.    Uh-huh.

4    Q.    So she had gotten pictures made that

5          morning or something?

6    A.    She took them herself, and when I was

7          getting ready to go up there again, they

8          sent somebody over to train me on the

9          computer.  When I say "they," I mean the

10         housing authority.  So I didn't get a

11         chance to go to her house at all.  And I'm

12         thinking from that time on I was having

13         training done and checking the folders for

14         the HUD audit.

15   Q.    When did you learn that y'all had to check

16         the folders for the HUD audit?

17   A.    They had told us maybe a month before.  I

18         can't remember exactly.

19   Q.    And do you remember, on the day this claim

20         happened or the day that the resident

21         called you about the water damage, do you

22         remember how far -- was the HUD audit

23         about to happen the next day or something

Page 112

1    asked to put it off.  But I provided you

2    with a fax of that.

3  Q.    And do you remember Ms. Sledge -- do you

4    remember signing this employee counseling

5    form?  Let me make sure I have all the

6    attachments to it.  Well, do you remember

7    Ms. Sledge counseling you about the water

8    damage incident?

9  A.    Yeah.

10  Q.    And I'm a little confused about what you

11    said happened, but is it the case that the

12    resident complained on June 18th about the

13    water damage, but then you didn't get a

14    chance to follow up with it until July 12,

15    2004?  Is that what happened?

16  A.    Well, I didn't get a chance to --

17  Q.    I'm just going on the dates on the form.

18  A.    I didn't get a chance to complete the form

19    until then because of the pressure I was

20    under to complete the audit for HUD and

21    for Visual Home.  It was like around the

22    clock.  And they never told us that we had

23    one day, 10 days, 20 days to get a claim

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 113

1      form in.  There was never a time limit on

2      it as to, I have X number of days to get

3      this claim form in.  So I concentrated on

4      the things that was most pressing, the

5      pressure I was receiving from them to get

6      the HUD audit done and the Visual Home

7      completed.

8  Q.  And then around this same time, did Ms.

9      Sledge counsel you about completing the

10     re-examination?

11 A.  Okay.  I believe so.

12 Q.  Does that sound right?

13 A.  Uh-huh.

14 Q.  What is that, the re-examination?

15 A.  Just computing the tenants' rent, just

16     calculating their rents based upon the

17     income verification that you have.

18 Q.  Is that something you had to do with all

19     of your tenants?

20 A.  Yes, but -- you have to do so many

21     monthly, yes.

22 Q.  Do you just do so many a month, or does it

23     depend on their anniversary date, or how

Page 114

1      does --

2    A.    Their anniversary date.

3    Q.    Okay.  And what happened with that

4          re-examination that caused you to have a

5          write-up?

6    A.    That was during the same time the Visual

7          Home and HUD audit were going on.  When I

8          got ready to compute the rent, I ended up

9          having to go to court.  I found out about

10         the court date maybe a day before.

11   Q.    What court date are you talking about?

12   A.    I had an eviction or something that I had

13         to go to district court for.

14   Q.    Did that have to do with the housing

15         authority?

16   A.    Yes.

17   Q.    So y'all were evicting a tenant or

18         something?

19   A.    Yes.  So I went to court.  When I got back

20         from court, it was just a few rents that

21         needed computing.  I was getting ready to

22         do those.  They sent over a lady to train

23         me again on the computer for Visual Home.

Page 115

1    She stayed there way past four o'clock

2    training me on the computer for Visual

3    Home.  My intention was to compute those

4    rents -- because it wasn't going to take

5    any time to compute them once I got back

6    from court -- and have the paperwork over

7    to accounting.  I didn't expect this lady

8    to come and train me on the computer;

9    nobody gave me any notice or anything.

10   And she stayed there the entire evening,

11   and I didn't get an opportunity to compute

12   anything.  So I faxed Ms. Sledge a fax and

13   asked her to send somebody over since I

14   was going to be out -- I was starting my

15   leave again -- to complete those

16   re-examinations of those rents.  In my

17   opinion, what happened, Ms. Sledge did not

18   do that, and apparently when close-out

19   date was due, I gather that's when she ran

20   into a problem.  Because had she sent

21   somebody the next day, they would have

22   been in accounting in time.

23   Q.   So this leave that you were talking about,

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 117

1   A.    Uh-huh.

2   Q.    And do you remember what the deadline was

3         for the re-examinations?

4   A.    We had a close-out date.  The close-out

5         date wasn't -- it wasn't due yet.  I think

6         it may have been a couple of days after

7         this.

8   Q.    Just for the record, we're talking about

9         the e-mail that's in Defendants' Exhibit

10        Number 4 dated July 21, 2004.  And it says

11        from Kerry Revell, but Ms. Manzy has said

12        that you were just using her computer.  I

13        apologize if I didn't hear you right, but

14        do you think the deadline for the

15        re-examinations fell during the time that

16        you were going to be on leave or was it

17        supposed to --

18  A.    It was a few days after that to get them

19        in -- our close-out date, to get them into

20        accounting.

21  Q.    So that deadline would have come while you

22        were gone?

23  A.    Yes, that's why I e-mailed her.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 119

1          a certain date.  That's the close-out

2          date.

3     Q.   Is it always the same date, like always

4          the 25th, or --

5     A.   No.

6     Q.   It changes every month?

7     A.   It changes.

8     Q.   Is it always toward the end of the month?

9     A.   Not always.  I think sometimes it'll be

10         like the middle of the month or whatever.

11    Q.   Okay.  And the re-examination is just when

12         you go through and you check the income

13         and make sure their rent is still

14         appropriate for their income?  Is that

15         what it is?

16    A.   Basically, you sit down and interview the

17         tenant and have to fill out several forms,

18         fill out several income verification.

19    Q.   But the purpose of it is to make sure that

20         the rent a tenant is paying is appropriate

21         based on their income?

22    A.   Based on income, uh-huh.

23    Q.   Do you need a break?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 123

1    had do with the water damage inspection?

2    A.    Uh-huh.

3    Q.    You did say earlier you didn't think Ms.

4          Sledge had discriminated against you on

5          the basis of race, but are you saying in

6          this lawsuit that these disciplinary

7          actions that were taken against you with

8          the suspension, that that had to do with

9          your race?

10   A.    I feel like Ms. Sledge was being told do

11         these things.  As a matter of fact, on one

12         incident, she told me that Mickey told her

13         to write me up.

14   Q.    Do you remember which incident that was?

15   A.    I'm thinking it was the one with the lady

16         and the rent notice, the Tamika White, if

17         that was her name.

18   Q.    Tonia Price?

19   A.    Yeah.

20   Q.    So what you're saying is that Ms. Sledge

21         told you that Mr. McInnish told --

22   A.    She said it wasn't a big deal to her, but

23         Mickey told me to write you up.

**1933 Richard Arrington Jr. Blvd. S. * Birmingham, AL 35209 * www.legalink.com**
**1-800-888-DEPO**

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 124

1  Q.    And you think that Mr. McInnish told her

2        that because you were black?

3  A.    Yes.

4  Q.    Is that right?  Okay.  Now, if you get

5        suspended from the Montgomery Housing

6        Authority, is there automatically a

7        hearing, a disciplinary hearing?

8  A.    I'm not quite sure.

9  Q.    You did have a hearing, though; right?

10 A.    For the dismissal.  For the dismissal, but

11       I'm not sure about for the suspension.

12 Q.    Here, let's see if we can figure it out.

13       Okay.  The notice of suspension was from

14       August 10th to August 16th, and the notice

15       of suspension is dated August 9, 2004.

16       And then also as part of Exhibit 4 is this

17       notice of departmental disciplinary

18       hearing.  Do you remember -- it says down

19       there that you refused to sign.  Do you

20       remember being shown a copy of that or

21       being told about a hearing, a departmental

22       disciplinary hearing?

23 A.    Yes.

Page 126

```
 1                separate suspension hearing.  Do you

 2                remember what happened at that hearing?

 3      A.        That's when I initially was informed that

 4                I had been written up for not inspecting

 5                the damages and those re-exams, I believe.

 6                Yeah.

 7      Q.        So you did attend a hearing?

 8      A.        Yes.

 9      Q.        And do you remember who was there?

10      A.        Just Ms. Sledge, Maxine Sledge, and her

11                assistant, Gelene Williams.

12      Q.        And at that hearing Ms. Sledge informed

13                you that -- I mean, you had already been

14                on suspension or you -- no, I guess that

15                would have occurred before your

16                suspension?

17      A.        I had returned back from my approved

18                annual leave.

19      Q.        And so then they had a hearing, and then

20                they suspended you; is that what happened?

21      A.        Yes.  Well, I think she did it all in one

22                day.

23      Q.        Okay.  And I missed part of what you said,
```

Page 127

1       but at the hearing they talked about the

2       water inspection -- I mean the water

3       damage inspection and the re-examinations?

4   A.  Yes.

5   Q.  And that was the only thing that was the

6       subject of that hearing, if you recall?

7   A.  Yes.

8   Q.  Okay.  Defendants' Exhibit 4 shows that

9       your suspension was Tuesday, August 10th

10      through Monday, August 16th.  Do you

11      remember, are those the days that you

12      took, or does that sound right?

13  A.  That sounds correct.

14  Q.  So you would have returned to work on

15      August 17th or -- I can't tell -- it may

16      be August 16th.

17  A.  August 17th.

18  Q.  And what happened when you returned to

19      work?  Do you remember anything about your

20      job or your working conditions or

21      anything?

22  A.  When I returned to work late that

23      afternoon, I believe Ms. Sledge brought

Page 129

1      when she scheduled a hearing in the

2      conference room.

3  Q.   This one is -- let's see.  It says that it

4      was given -- or it indicates it was given

5      to you on the 17th, which is consistent

6      with what you just said.  What I'm asking

7      is did she just bring it over there to you

8      or did she say -- it says in the -- to

9      consider disciplinary action against you

10     for the following reasons.  And then it

11     says, violation for Group III penalties

12     for Offenses K, and it says, which is

13     proven incompetence or inefficiency in the

14     performance of assigned duties in his or

15     her position.  What I'm asking is did Ms.

16     Sledge talk about what she thought would

17     be those violations there had been, or did

18     she just hand it to you and walk away, or

19     just tell me what you remember.

20  A.  She sat there; I read it; and I explained

21     to her -- I asked her how could they be

22     writing me up again; I had just gotten

23     back to work and, you know, I had such a

Page 130

1    heavy workload.  And she said to me, I

2    agree with you, Ms. Manzy; it's not fair

3    around here, but we have to do what we

4    have to do, and she gave this to me.  And

5    I think I was working on something on the

6    computer with Visual Home and she stopped

7    and helped me complete that and then left

8    the office.

9    Q.    So did she give you this at the end of the

10         day or the beginning of the day?

11   A.    At the end of the day.  She came over

12         there about 4:30.

13   Q.    And then this shows that you refused to

14         sign; is that correct?

15   A.    Correct.

16   Q.    So did you know at this point that you

17         might be terminated or you just thought

18         there was another write-up or another

19         hearing?

20   A.    No, I didn't know I was going to be

21         terminated, I don't think.  But it was for

22         -- isn't it for a dismissal hearing?

23   Q.    Let's see what it says.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 132

```
 1          there for whoever.  By her being the

 2          department head, I assumed, since she knew

 3          she was suspending me, that she would send

 4          someone over to carry on the work.  And

 5          she didn't.  But I was working on the

 6          folders, and I had them on my desk.  I

 7          left them on top of my desk with notes on

 8          them as to what had to be done to them.

 9     Q.   Which folders?

10     A.   The move-out folders.  The ones she wrote

11          me up for that.

12     Q.   So there was a stack of move-out folders

13          that you were --

14     A.   That I was in the process of working on.

15          And when she brought me the suspension

16          paper or whatever, I left them there, but

17          I still left notes on them, you know,

18          thinking she was going to send somebody

19          over to complete them since she knew I

20          wasn't going to be there, as to, you know,

21          what had to be done to them and the stages

22          -- some of them I had already keyed into

23          the computer.  But instead of her sending
```

Page 136

1      her talking, but I don't remember her

2      specifically, you know, one, two, three,

3      that type thing.

4    Q.    Was there anything that you remember her

5          testifying about that you thought just

6          wasn't true?  I guess I'm trying to ask

7          you if you thought it wasn't true or you

8          thought it was true, but there was just no

9          way I could get to it because of my

10         workload.

11   A.    Some of it I thought just wasn't true and

12         some of it, like I stated today, I had a

13         heavy workload.

14   Q.    Do you remember anything that you thought

15         wasn't true?

16   A.    The fact that she said the other managers

17         always had their paperwork in and notices

18         done in a timely manner.

19   Q.    So you think there were managers who did

20         not have the paperwork in?

21   A.    She had to call for paperwork mostly every

22         month.  She had to send us memos -- I mean

23         faxes saying, you know, such-and-such

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 137

```
 1              project doesn't have their rent changes
 2              in; we need them in.
 3      Q.      Do you remember any specific examples of
 4              that?
 5      A.      You mean specific complexes -- projects --
 6              communities?
 7      Q.      Well, that's probably a bad question.  Do
 8              you remember any times that you have
 9              personal knowledge of other managers who
10              may have made the same kind of mistakes
11              you made.  Do you remember any specific
12              examples of that?
13      A.      Examples like who they were?
14      Q.      Who they were and maybe how they messed up
15              in their paperwork?
16      A.      I know some didn't always have their rent
17              changes in on time.
18      Q.      Do you remember who they were?
19      A.      She was just calling for different
20              communities.  I know two during the time
21              she wrote me up didn't have their rent
22              changes in and that was -- I don't know
23              what community she had.  That was Deborah
```

Page 138

1          Reynolds and I think Melissa Pickett.

2    Q.    Deborah Reynolds?

3    A.    And Melissa Pickett.

4    Q.    Is Ms. Reynolds black or white?

5    A.    She's black.

6    Q.    And Ms. Pickett, is she white or black?

7    A.    She's black.

8    Q.    Did they get terminated?

9    A.    No.

10   Q.    Any other more examples like that, that

11         you can think of?

12   A.    Well, Ms. Sledge herself, almost each

13         month she faxed memos to all the managers

14         saying that, I don't have rent changes for

15         this community or that community. I can't

16         remember the specific communities, but she

17         would send out faxes. It was like on a

18         monthly basis. It was just -- I don't

19         want to say a habit, but nobody ever had

20         all their work in on time. If it was me

21         this month, it was somebody else next

22         month. If it wasn't me this month, you

23         know, it was somebody else. So it was

Page 140

1          office was --

2    Q.    By all the managers?

3    A.    By all the managers, everybody.  So it's

4          not like I'm an isolated case of a person

5          who makes mistakes; everybody's making

6          them.

7    Q.    Do you know any other African-American

8          managers who were fired for making those

9          mistakes?

10   A.    Well, I know of -- I don't know that -- I

11         don't know her case.  I don't know the

12         facts of her case, but I know there -- I

13         don't know if she was fired, to be honest.

14         And you asked me about her earlier.  I

15         don't know if she was fired or she just

16         left, so I really don't know.

17   Q.    So to your knowledge, you don't know of

18         any other African-American mangers who

19         were making the same mistakes you did and

20         they were terminated?

21   A.    I can give you her name, but I don't know

22         if she was fired or they forced her to

23         resign.

Page 141

1   Q.   Well, I mean other than that lady.  What's

2        her name?  I think you gave it to me.

3   A.   No, I didn't give it to you.  It's Maggie

4        Gardner.

5   Q.   But you're not sure what her situation

6        was?

7   A.   I don't know if she was forced to resign

8        or she just left.

9   Q.   So other than Ms. Gardner, is there any

10       other African-American managers that made

11       the same mistakes you made and were

12       terminated or were terminated for making

13       fewer or more mistakes than you did?

14  A.   We're the only two that I know of.

15  Q.   You say that, but then you also said

16       you're not sure about Ms. Gardner's

17       situation?

18  A.   Right.  I really don't.  The reason why

19       I'm saying that, what I'm saying, I don't

20       want to say she was fired for making

21       mistakes.  I just know what the rumors

22       were, but I don't know her case like I

23       know my case.  I don't know if she ever

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 142

1        got written up or whatever.  I don't know

2        her case; I just know what the rumor is.

3    Q.   And what is the rumor, that she made

4        mistakes and got terminated?

5    A.   That they fired her for whatever reason, I

6        don't know.

7    Q.   And I think you said that while you were

8        on leave Ms. Sledge and maybe some others

9        went through your files or went through

10        your office?

11    A.   They said they did a search of the office.

12        That's what Rudy Martinez told me, that

13        while I was on leave they did a search of

14        the office.

15    Q.   And if Ms. Sledge said that the move-out

16        paperwork was incomplete, you don't

17        dispute that, do you?

18    A.   Depending on which ones.  Some of them I

19        completed and some of them I didn't, but

20        the thing with that is that I left notes

21        on them.  That's what we were supposed to

22        do.  If something wasn't completed or was

23        in the file that wasn't completed, you had

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 143

1    notes on them as to what it is that still

2    needs to be done to it, which indicated

3    that you are aware of it and you're

4    working on it.  So each file that she

5    found or whatever, I had documented --

6  Q.    Each move-out file?

7  A.    -- those files.  Yes.

8  Q.    And then if Ms. Sledge, at the hearing on

9    September 25th, during her inspection, if

10    she said that there were nine vacant units

11    but only two had been inspected, would you

12    have any reason to dispute that?

13  A.    I do dispute that.

14  Q.    Tell me about that.

15  A.    I had inspected all of those apartments.

16    I had inspected all of them; that was

17    indicated on the folders.  I had completed

18    the vacated forms.  Those was on the

19    folders.

20  Q.    I'm sorry, what, now?

21  A.    I had inspected the apartments.  I had

22    done the inspections.

23  Q.    And did you complete all the paperwork

Page 144

1          that went along with them?

2    A.    Some I had.  I was in the process of

3          completing them when she suspended me, the

4          day she came over and told me I was

5          suspended.

6    Q.    So did you have those out on your desk

7          with notes on them?

8    A.    I had those on my desk with notes on them.

9          And I had the forms showing that I had

10         inspected them and what I had found.  I

11         had all that on those folders.

12   Q.    Were these apartments that people had just

13         recently moved out of?

14   A.    Yes.  Sometimes they skip out and you

15         don't know they're gone.  And then one

16         incident, this lady, I had documented her

17         file; I was working with her.  She had a

18         situation going on where she was away from

19         her apartment for a while.

20   Q.    What do you mean?

21   A.    She was out of town.  She had some type of

22         personal problem with her son or something

23         being in the hospital, I can't remember.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 146

1    done to the folders.

2    Q.    At what point do you go into the computer

3          and start entering information about

4          vacancies?

5    A.    I believe it was once you inspect them or

6          whatever.

7    Q.    And if Ms. Sledge said only two of them

8          had been entered into the system, would

9          you have any reason to dispute that?

10   A.    I can't recall, but they wasn't in there.

11         The paperwork on the folder -- because you

12         have to document what you found wrong with

13         the apartment in the inspection folder.

14         That was with the folders, and if I hadn't

15         called it in to maintenance, it was just

16         because of my workload.  Something else

17         probably came up and I, you know, did that

18         and was going to get back to that.  But

19         they knew that they had been inspected

20         because the inspection forms indicated the

21         things I found wrong.

22   Q.    There were some files that were not

23         corrected after a HUD audit review.  Do

Page 147

1    you remember anything about that?

2    A.    I dispute that because we had to correct

3    the file then send her copies of -- not

4    only send her a copy, I think we had to

5    take the folder back to her as to the

6    correction that was made.

7    Q.    You're saying you needed to take the file

8    back to Ms. Sledge?

9    A.    Yes.

10    Q.    Okay.  Now tell me again what you were

11    saying.

12    A.    The correction that -- I guess the mistake

13    or whatever she was referring to that was

14    a HUD audit, I dispute that because all of

15    the findings that they said needed to be

16    corrected, I corrected them at that time.

17    And on top of that, I had to type a memo

18    to Ms. Sledge as to what the correction

19    was and when I did it, and I think she had

20    to get a copy to Mr. McInnish.  And I

21    believe she again looked at the folder, so

22    the correction, I definitely dispute that.

23    Q.    So do you know why she would say that the

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 148

1      error had not been completed if it had

2      been?

3   A.    If she wanted to find grounds to dismiss

4        me, I'm sure she would find anything.

5        While I was not there, they went into my

6        office.  I wasn't there to see what they

7        did or what they didn't do.

8   Q.    Earlier you said that you thought that

9        Mr. McInnish had told Ms. Sledge to do one

10       of your write-ups?

11  A.    I didn't think; she told me.

12  Q.    So she told you that he told her to do one

13       of your write-ups.  But do you think this

14       is just something she's making up?

15  A.    No, I think she's acting -- I think she

16       was acting on what she was being

17       instructed to do from Mr. McInnish.

18  Q.    Another thing that she talked about at

19       that hearing was there was some charges to

20       the residents that had not been applied to

21       their accounts.  What --

22  A.    I'm not familiar with that.  I don't know

23       what she was referring to.

Page 149

1   Q.   Well, as a manager, are there -- like if

2        somebody is evicted, do you get involved

3        in the eviction process?

4   A.   Yes.

5   Q.   And then what -- I mean, if there's like

6        attorney's fees or maybe some damage fees

7        or something like that, is there ever

8        something that might get charged back to

9        the resident?

10  A.   We do post those to the account.  I had

11       did those too.

12  Q.   Well, do you know what she's talking about

13       when she said there were some charges that

14       had not been applied?

15  A.   I guess she was referring to those.

16  Q.   To which ones?

17  A.   To the charges not being filed.  We had to

18       do the paperwork, send it over to

19       accounting, and they had runners or

20       somebody to pick them up.  If they didn't

21       come pick them up, if we were too busy,

22       they didn't get over there.  But all of

23       those things she's complaining of, they

Page 150

1      were with the folder indicating to her

2      that I was in the process of working on

3      them.

4  Q.   So there would have been --

5  A.   There would have been the charge slip with

6      whichever folder she's referring to.

7  Q.   And when you took your -- or when you were

8      suspended, did you leave notes on every

9      folder that you were working on?

10 A.   It was just those that was on my desk,

11      those move-outs that I knew had to go over

12      there, that I was in the process -- that I

13      had on my desk working on.

14 Q.   Well, you said there were notes on the

15      inspection files also, and then I think

16      you just said --

17 A.   That was the move-out files, the

18      inspection files, the move-out files.

19 Q.   So the move-out files are the same as the

20      vacancy files?

21 A.   Yes.

22 Q.   Okay.  That's where I was getting

23      confused.  So were there also notes then

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 151

```
 1            on the charges that were going to be

 2            applied to the residents?

 3      A.    Okay.  I'm thinking those charges she's

 4            talking about are for the vacancy, the

 5            move-out files.

 6      Q.    Is that the same kind of file as an

 7            eviction file?

 8      A.    Well, yeah, because you have to inspect

 9            the folders, so it may have been one of

10            the inspection folders.  I can't recall

11            specifically which one she's referring to.

12      Q.    But if your memory is right, then this

13            would have been part of the files that

14            were on your desk that you didn't get to?

15      A.    Right, that I was in the process of

16            working on and left for her to work.

17      Q.    What about setting some temporary rents as

18            opposed to -- or setting a temporary rent

19            for a tenant and then not following up on

20            it to establish the correct amount of

21            rent?  She testified about that at that

22            hearing also.

23      A.    I don't know what she was referring to.
```

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 152

1    Q.    Do you know what a temporary rent is?

2    A.    Yes, when you just put them on a rent

3          temporarily until you get their income

4          verification in, then you go back and

5          change it.

6    Q.    So were there some that you had not been

7          able to change yet?

8    A.    I can't recall.  It may have been, but if

9          it was, I documented my file and

10         apparently I was waiting for something to

11         come in.  Now -- so if it was,

12         documentation was on the folder.  I don't

13         recall it right now.

14   Q.    Well, if Ms. Sledge testified that there

15         were some that had not -- there were some

16         that just had temporary rent and that the

17         permanent rent had not been set yet, would

18         you have any reason to dispute that, or

19         would that just be because you hadn't

20         gotten to it yet?

21   A.    I don't recall.

22   Q.    And did you ever establish flat rents for

23         tenants?

**LEGALINK, A MERRILL COMPANY**
Court Reporting * Legal Videography * Trial Services

Page 153

1    A.    If they were supposed to be on a flat

2          rent.

3    Q.    When is it that you put them on a flat

4          rent?

5    A.    I can't recall.  But I do know that they

6          didn't provide us with the correct flat

7          rent amounts.

8    Q.    Tell me when you use a flat rent.

9    A.    It's basically when the tenant rent is a

10         certain amount -- there's like a cap, and

11         I think when they get to that cap, you put

12         them like -- that flat rent is just like

13         the cap, the maximum that you can charge

14         them for that apartment.

15   Q.    And then are you supposed to come back and

16         convert it to an income based rent?

17   A.    If their income changes where it's no

18         longer at the flat or the cap rent.

19   Q.    So when do you income rent and when do you

20         do flat rent?

21   A.    When you compute their rents, whatever

22         their rent calculates to be, if it was at

23         the flat rent rate, you have to charge

Page 155

1    Q.    But don't you have to have a lease in

2          every file, signed and completed?

3    A.    You do, but then you have to get the

4          tenant in to sign them. Sometimes they

5          may not come in or the lease may have been

6          wrong. But as far as my knowledge, all my

7          files had leases.

8    Q.    Well, if Ms. Sledge testified under oath

9          that there were some files that didn't

10         have them, would she just be making that

11         up?

12   A.    I don't recall none of my files not having

13         leases.

14   Q.    So do you have any explanation as to why

15         Ms. Sledge would have testified to that?

16   A.    No, I don't.

17   Q.    What about ceiling rents? Did you have

18         files that had ceiling rents on them?

19   A.    There may have been a few.

20   Q.    Did you know that the housing authority

21         had not used ceiling rents since November

22         of 2003?

23   A.    I'm thinking she didn't inform us of that

Page 156

1      until much later after they had been used.

2    Q.    You're saying Ms. Sledge didn't tell y'all

3          that?

4    A.    Yes.

5    Q.    Who is y'all?

6    A.    The other managers.

7    Q.    So were there other managers who were

8          using ceiling rents?

9    A.    I don't know.

10   Q.    How would she normally have notified you

11         about the change in the ceiling rent?  Is

12         that something you would get a memo on or

13         did a meeting or how would you --

14   A.    Probably in a meeting or memo, but they

15         would give us a table, a rate table.

16   Q.    That had all of the rents on it or

17         something?

18   A.    Uh-huh.

19   Q.    Is it your testimony that you just didn't

20         receive a rate table?

21   A.    I don't recall her telling us something

22         like we wasn't using ceiling rents or --

23         okay.  Ms. Sledge and Mr. McInnish were

Page 157

1          both confused about that flat rate and

2          ceiling rate.  So probably when they

3          stopped using whatever, I don't feel that

4          I was adequately informed.

5     Q.   About the decision not to use that?

6     A.   The ceiling rents.

7     Q.   Okay.  And we already talked about the

8          incomplete annual re-examinations; right?

9          That would have been what was in that

10         second write-up; is that right?

11    A.   You said interim?

12    Q.   Incomplete annual re-examinations.

13    A.   I think so.

14    Q.   And was there a lot of filing that had not

15         been done yet that you had in your office

16         that you just had not had a chance to file

17         yet?

18    A.   I don't think so, because I had came in on

19         a weekend and worked, and I had had one of

20         the other managers come with me so we

21         could catch up on the filing.  And then

22         because of the audit that was coming up,

23         they had a temporary girl there from Kelly

Page 158

1        Services.   She had completed the other

2        filing.

3   Q.   So it's your testimony that you were

4        caught up on your filing?

5   A.   To the best of my knowledge I was.

6   Q.   Did you tell Ms. Sledge that -- let me

7        back up.  Did Ms. Sledge ever talk to you

8        about, these are all the things that were

9        wrong with your files while you were gone?

10  A.   No.

11  Q.   So when did you first learn of that?  Was

12       that at the hearing with Mr. Luck?

13  A.   I believe so.

14  Q.   And then did you testify about anything?

15  A.   Well, I'm recalling back to -- it probably

16       was the dismissal hearing where Mickey

17       said they had -- not Mickey.  Rudy

18       McInnish said they had conducted a search

19       of the office.

20  Q.   You mean Rudy Martinez?

21  A.   Uh-huh.

22  Q.   Well, is it your belief that all the other

23       managers had this -- that their files were

Page 160

```
 1              terminate them, what makes you think your

 2              termination was because of race?

 3    A.        Because he treated the white employees

 4              better.  I don't know if he was eventually

 5              going to get around and terminate the

 6              other black employees or not, but I know

 7              how he treated me as opposed to the white

 8              employees.

 9    Q.        Do you know how he treated the other black

10              managers?

11    A.        I can't speak for them.  I don't know.

12    Q.        There are eight housing authority

13              communities; is that right?

14    A.        I'm not for sure.

15    Q.        Well, I have a list of some.  I have

16              Cleveland Court, Gibbs, Riverside, Tulane,

17              Patterson, Trenholm, Smiley, and

18              Richardson Terrace.  Are there any others

19              you can think of?

20    A.        You said Riverside?

21    Q.        Yes, ma'am.

22    A.        Okay.

23    Q.        And of those eight, to your knowledge, are
```

Page 161

1         any of those smaller -- you were

2         responsible for Patterson; right?

3   A.    Yes.

4   Q.    Are any of those eight communities smaller

5         than Patterson except for Cleveland Court

6         and Richardson Terrace?

7   A.    I'm not sure.  I don't know.

8   Q.    So if I said that Gibbs and Riverside and

9         Tulane and Trenholm and Smiley were all

10        bigger than Patterson, would you have any

11        reason to dispute that?

12   A.    Probably not, but I'm thinking those may

13        have been the ones that had an assistant

14        there, a clerk or somebody, so it was like

15        two people or maybe three if the social

16        worker had...

17   Q.    Did you know the manager at Tulane?

18   A.    I can't recall who it was.

19   Q.    Do you know if he or she had any problems

20        with their files and getting their

21        paperwork done?

22   A.    In the manager meetings, all of the

23        managers complained about their workload

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 162

1    and needing help, needing assistance. So

2    based upon that and based upon some

3    conversation with them, yes, they had

4    trouble in their offices.

5    Q.    Well, do you remember who it was that you

6          had conversations with?

7    A.    No.

8    Q.    Going back to the write-ups that Ms.

9          Sledge did, is it your belief that

10         Mr. McInnish made her do all of those, all

11         the write-ups?

12   A.    Yes.

13   Q.    And is it your belief that when she

14         testified under oath at a hearing about

15         the problems that she had found, that he

16         was making her testify?

17   A.    Yes.

18   Q.    What evidence of that do you have?

19   A.    The fact -- the one time she told me

20         Mr. McInnish told her to write me up.

21   Q.    And that is the write-up for when the

22         resident complained about the rent change?

23   A.    Yes, I believe so.

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 163

1    Q.    But managers are expected to get rent

2          change forms out timely; right?

3    A.    Yes, if possible.

4    Q.    That's part of a manager's job; one of the

5          duties is to get the rent change forms

6          out; right?

7    A.    Yes.

8    Q.    So you did in fact -- it did take you some

9          time to get that rent change form out;

10         right?  I mean, it wasn't done in a timely

11         fashion; is that correct?  Because I think

12         you said something with your workload?

13   A.    Uh-huh.

14   Q.    So you were late in getting it out?

15   A.    Yes.  But Deanne, the white accounting

16         clerk, could have posted it to her receipt

17         and she still would have had notice.

18   Q.    But that doesn't have anything to do with

19         -- I mean, with what you still have to do

20         as a manager.  I mean, everybody has their

21         own job to do; right?

22   A.    Well, yes, but everybody wasn't -- had

23         excessive workloads or had assistance --

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 164

1        they had assistance with their work and I

2        didn't.

3  Q.    So basically if I understand you, you're

4        saying that the problems that we've talked

5        about today, just if you had had an

6        assistant, you could have gotten the work

7        done?

8  A.    That's the way it was in the past, yes.

9  Q.    I know I asked you this question before,

10      and you answered it I think, but -- I

11      mean, nobody ever told you, we're

12      terminating you because of your race;

13      right?  I know that sounds like a crazy

14      question, but I need you to answer it.

15  A.    No.

16  Q.    And the reasons they gave were because of

17      the write-ups that we've discussed here

18      today; is that right?

19  A.    Yes.

20  Q.    And you don't dispute that there were

21      problems with your files and that -- you

22      know, the problems that we've talked about

23      today, with the rent form being mailed

Page 166

1    treated on that job as a black employee as

2    opposed to the white employees.

3  Q.    And that's the stuff we talked about

4    earlier today?

5  A.    Yes.

6  Q.    Are there any white employees that you

7    know of who made the kind of mistakes that

8    we've talked about today here with you who

9    did not get terminated?

10  A.    I don't know about, you know, other

11    people's work, but I'm sure they made

12    errors.

13  Q.    But I mean, do you know of any? As you

14    sit here today, do you have any knowledge

15    about them?

16  A.    No.

17  Q.    Do you think that they just made up all

18    this stuff, all the problems with the

19    files, or is it your position that they

20    just applied it too harshly to you? Did

21    that make sense?

22  A.    Yeah, that makes sense. I feel like it

23    was applied too harshly -- considering the

Page 169

1    whether or not one person could do that

2    versus two people?

3  A.   The fact that he provided them with help,

4    you know, indicating that apparently she

5    had a heavy workload; he gave her relief.

6    I had a heavier workload.  Initially there

7    were two people in the office so

8    apparently two people couldn't have done

9    it -- or one person couldn't have done it.

10  Q.   Do you know anything about how the white

11    employees' workloads that you're talking

12    about -- and when I say the white

13    employees, I'm talking about the ones you

14    named earlier for me today, just so you

15    know.  Do you know anything about how

16    their workload compared to yours

17    specifically?

18  A.   I don't think that matters.  I don't think

19    that matters.  It matters that I had an

20    excessive workload; they had an excessive

21    workload; they were given help; I was not.

22  Q.   Well, what if whatever had to be done in

23    accounting was something that really

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 170

1       needed three or four people to do, but

2       they were just making do with two people?

3   A.  Well, that was an opinion.

4   Q.  But that's what I'm asking, though.  It

5       sounds like yours is an opinion.  That's

6       what I'm trying to find out, is where do

7       you figure out --

8   A.  It was an opinion that he -- if he thought

9       they needed help and I didn't, that was

10      his opinion, whereas -- and the evidence

11      is there.  If I made those kind of

12      mistakes, in my opinion, you need help,

13      because this is not a person who did

14      sloppy work until her help was taken away

15      or the workload got excessive.  So if

16      you're going to help one person, why be

17      prejudiced and not help the other one

18      simply because she's black and you're

19      creating a hardship for her.

20  Q.  I apologize, because it sounds like I'm

21      harping on this, but I just want to know

22      if you had any personal knowledge about

23      how a manager's workload or your workload

Page 171

```
 1            in particular compared to, you know, Jill

 2            West's workload or the other individuals

 3            that you named, like Deanne Smith or the

 4            Wendy individual who worked in the Section

 5            8 office.  Do you have any knowledge about

 6            how their particular --

 7   A.       I have knowledge of Kerry Revell's.

 8   Q.       You do have knowledge about Kerry

 9            Revell's?

10   A.       She worked in the office with me.

11   Q.       Okay.  Well, we'll come back to her, then.

12            And then Diane Bishop was a manager;

13            right?

14   A.       Uh-huh.

15   Q.       Okay.  Well, let's talk about the other

16            three, Deanne Smith, Jill West, and Wendy

17            in the Section 8 office.  Do you have any

18            knowledge about how what you had to do

19            every day compared to what they had to do

20            every day?

21   A.       Not really, no.

22   Q.       And then you said you did have knowledge

23            about Kerry Revell's.  Tell me about that.
```

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 172

1    A.    She just basely conducted activities for

2          the children in the center after school.

3          From 8 to 12 there was no children in the

4          center; there was no activities to be

5          done.  I think she did maybe a couple of

6          move-in inspections where she had to go

7          out to the person's home and inspect, and

8          that was about two days a week.

9    Q.    Do you know what her salary was?

10   A.    No, I have no knowledge of that.

11   Q.    When you were working with Kerry, was your

12         salary around 37 or 39?  Would that be the

13         right time frame?

14   A.    Yes.

15   Q.    Would it be the case that, you know,

16         managers were expected to do more because

17         they were making a lot more money?

18   A.    I don't know.

19   Q.    And then Diane Bishop was the other

20         person.  Because she was a manager, is it

21         your position that you do have knowledge

22         about her workload?

23   A.    Yes.

Page 173

1    Q.    And what is it you know about her

2          workload?

3    A.    She basically did the same thing and the

4          same duties I did, but she had a smaller

5          unit.  And a lot of times you have to look

6          at the characteristics of the complex.

7          What I mean by that is the residents and

8          how they may keep you busy.  She had

9          mostly elderly people and handicapped

10         people.  Elderly people pay their rent

11         around the first of the month.  They

12         normally do what they have to do.

13   Q.    Do you have any knowledge about what Diane

14         Bishop's salary was?

15   A.    It should have been comparable to mine or

16         more.  I really don't know.

17   Q.    And then what about the -- because like

18         the manager who worked at Trenholm and the

19         manager who worked at Smiley, they had a

20         lot more units than you did, didn't they?

21   A.    They probably did, yes.

22   Q.    To your knowledge, the managers that were

23         there, are they still there?

Page 184

1           differently than you?

2    A.     Yes.

3    Q.     And have we talked about all the reasons

4           that you think you were discriminated

5           against?

6    A.     Yes.

7    Q.     And have we talked about all the ways that

8           you feel like you were discriminated

9           against?

10   A.     Yes.

11   Q.     Did you ever hear any of the people out at

12          Montgomery Housing Authority make any kind

13          of what I would call a racial slur or a

14          racial comment?  You know, Mr. McInnish I

15          think is the one you said you feel like

16          discriminated against you.  Have you ever

17          heard him make any kind of racial comment

18          towards you or about anybody?

19   A.     No.

20   Q.     And I know you had a hearing with Mr. Luck

21          and then you had a hearing with the

22          personnel board at the city of Montgomery.

23          And both of those hearings, the outcome

Page 185

1          was in favor of the Montgomery Housing

2          Authority; is that correct?

3     A.    Yes.

4     Q.    Do you feel like the hearing officers were

5          -- did you feel like they were racially

6          motivated in their decision?

7     A.    No.

8     Q.    So what is it that you think caused the

9          outcome of those hearings, then?

10    A.    I guess believing what was reported to

11         them.

12    Q.    You never had any injuries on this job?

13    A.    Injuries?

14    Q.    Injuries, yeah.

15    A.    No.

16    Q.    Have you ever filed bankruptcy?

17    A.    Not yet, no.

18    Q.    And where do you work now?

19    A.    Alabama State University.

20    Q.    And what's your salary?

21    A.    $7.82 an hour.

22    Q.    And what's your job title?

23    A.    On-call dorm supervisor.

LEGALINK, A MERRILL COMPANY
Court Reporting * Legal Videography * Trial Services

Page 198

1           MR. HURST:  No, I don't even

2                think I alleged anything.

3           MS. ROGERS:  You didn't, but I

4                wanted to make sure.

5           MR. HURST:  No.

6           MS. ROGERS:  Okay.

7    Q.    In your complaint you said that there were

8          some white employees who got better job

9          assignments but who had the same pay or

10         greater pay.  Do you have any specific

11         knowledge about the salaries of any of the

12         white employees at the housing authority?

13   A.    No.

14   Q.    Was there anybody who got any kind of

15         special training, whether it be computer

16         training or training to fill out forms or

17         anything, that you did not receive?

18   A.    You mean someone outside of management?

19   Q.    Well, we'll just stay with managers

20         because -- were there any managers who --

21         well, let me back up.  Was there any

22         training you needed to be able to do your

23         job better?

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 200

1   A.   Yes.

2   Q.   Were there classes that they offered or

3        something, or you just wanted --

4   A.   No, there are -- I mean, colleges like AUM

5        offer classes like that, or I thought

6        maybe if he knew of an agency that could

7        come in and assist us.

8   Q.   Did anybody that you know of get any kind

9        of time management training, anybody that

10       worked at the Montgomery Housing

11       Authority?

12  A.   Not that I'm aware of.

13  Q.   Other than the write-ups that we've talked

14       about today, are you aware of any

15       complaints that were made about you and

16       your work performance?

17  A.   No.

18  Q.   Are you seeking punitive damages from the

19       housing authority?  Punitive damages are

20       damages that are designed to punish.

21  A.   Punish?  I'm not for sure.

22  Q.   Do you think the housing authority has

23       done something they need to be punished

**LEGALINK, A MERRILL COMPANY**
**Court Reporting * Legal Videography * Trial Services**

Page 252

1   A.   That they were not getting written up?

2   Q.   Yes.

3   A.   I never -- there's a rumor mill there.   I

4        never heard of one getting written up.

5   Q.   So it's just based on the rumor mill?

6   A.   They're usually true at the housing

7        authority.

8   Q.   You say you're not aware of any timelines

9        about turning forms in.  Did you think you

10       had as long as you wanted to turn stuff

11       in?  I mean, you knew you had to turn it

12       in timely; right?

13  A.   Yes, I did.

14  Q.   Okay.  That's all I have.

15                (The deposition of DOROTHY

16                 MANZY was concluded at 4:05

17                 p.m. on March 17, 2006.)

18

19

20

21

22

23