**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **DOROTHY MANZY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:05-cv-395-ID-SRW** |
| | ) | |
| **MONTGOMERY HOUSING** | ) | |
| **AUTHORITY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

**Montgomery Housing Authority** ("MHA") states as follows in support of its Motion for Summary Judgment:

**NARRATIVE SUMMARY OF UNDISPUTED FACTS**

**I.    Introduction**

Plaintiff has sued MHA for racial discrimination.  Plaintiff worked for MHA as a Public Housing Manager for Paterson Court and was terminated in August 2004 for proven incompetence and inefficiency in the performance of her job.  (Compl. ¶¶ 4-5; Pl. Dep. at 18:2-4.)  Plaintiff appealed her termination, and a dismissal hearing was held before an administrative hearing officer.  (Martinez Aff. ¶ 14.)  The hearing officer held that MHA acted appropriately in recommending the termination of Ms. Manzy. (Martinez Aff. ¶ 14 and at Ex. A; Compl. ¶ 5.)  Plaintiff then appealed to the City of Montgomery Personnel Board, and another hearing was

held. (Martinez Aff. ¶ 15.)   The City of Montgomery Personnel Board also upheld MHA's decision to terminate Ms. Manzy.  (Martinez Aff. ¶ 15 and at Ex. B; Compl. ¶ 6.)


**II.      Plaintiff's Employment History at MHA**

Plaintiff worked for MHA for nineteen years. (Compl. ¶ 4; Pl. Dep. at 14:5-7.)   She started as a management assistant, making approximately $12,000 per year.  (Pl. Dep. at 20:3-5, 21:15-17.)  She was promoted to assistant manager.  Id. at 21:18-22, 23:3-8, 24:16-22.   As an assistant manager, Plaintiff earned approximately $20,000 per year.  Id. at 22:11-13.  She was later promoted to manager of Smiley Court in 1994. Id. at 23:17-21, 24:8-12.   For most of the time that she worked at Smiley Court, she had a clerk typist and a assistant manager who reported to her. Id. at 25:21—26:15; 27:10-12, 22-23; 28:5-8.

After Smiley Court, Plaintiff became the manager of Trenholm Court. Id. at 29:5-9. Plaintiff had an assistant manager working under her at Trenholm Court. Id. at 29:23—30:17. By the time she began working at Trenholm Court, Plaintiff was making in the upper 20s, between $27,000 and $29,000 per year. Id. at 31:15-20.

Next, Plaintiff became manager of Paterson Court. Id. at 32:1-5.  Plaintiff was making approximately $37,000 when she became the manager of Paterson Court and was making around $39,000 when she was terminated.  Id. at 35:1-7.  When she first became manager of Paterson Court, she had an assistant manager, but it is Plaintiff's recollection that she did not have an assistant manager during the last year or so that she managed Paterson Court.  Id. at 32:6-16; 33:7-18.  Plaintiff stated that her assistant manager was laid off when MHA reduced its staff. (Pl. Dep. at 33:22—34:1.)

At one time, the managers of each of the eight housing community had assistant managers.  (Martinez Aff. at ¶ 4.)  Sometime around 2002, MHA went through a reorganization and laid off all but four assistant managers due to lack of funding.  Id.  Two of the four were assigned to the two largest housing communities, and two were used as floaters. Id.  The floating assistant managers did banking work and would fill for a manager who was absent. Id.  The community workers were retained at each housing community.  Id. at ¶ 5.  They were to continue with their job duties but were also to assist the managers to the extent possible by answering phones and greeting people.  Id.

Ms. Manzy was terminated in August 2004.  Id. at ¶ 6.  In the July/August 2004 timeframe, the occupancy rates for the housing communities were as follows:

| Community | Total | Occupied |
|---|---|---|
| Riverside Heights | 647 | 396 |
| Gibbs Village | 502 | 488 |
| Smiley Court | 368 | 276 |
| Trenholm Court | 353 | 262 |
| Tulane Court | 299 | 254 |
| Paterson Court | 200 | 192 |
| Cleveland Court | 150 | 141 |
| Richardson Terrace | 100 | 72 |

Id.

The housing community that Ms. Manzy managed, Paterson Court, was the third smallest housing community and had the third lowest number of occupied units. Id. at ¶ 7.  The number of occupied units at Paterson Court was about 75% of the next largest housing community, which had 254 occupied units.  Id.  Ms. Manzy's community had about 39% of the occupied units at Gibbs Village and about 48% of Riverside Heights, the two largest communities where assistant managers were assigned.  Id.  Ms. Manzy was responsible for managing fewer than half the

number of occupied units in the housing communities where assistant managers were assigned.

<u>Id.</u>

### III.    Disciplinary Action Against Plaintiff for Failure to Perform Job

Plaintiff's supervisor at MHA was Maxine Sledge. (Sledge Aff. ¶ 4.)  Ms. Sledge is an African-American female.  <u>Id.</u> at ¶ 3.  Before Plaintiff was terminated, Ms. Sledge counseled Plaintiff on two separate occasions for several violations of the employee handbook.  <u>Id.</u> at ¶¶ 11-14.    Plaintiff acknowledges receiving, reading, and understanding the employee handbook. (Pl. Dep. At 39:18-23; 40:21—41:4.)

#### A.    First Write-Up

In January 2004, Ms. Sledge counseled Plaintiff for a failure to comply with MHA policies and procedures.   (Sledge Aff. ¶ 11.)   This counseling session arose out of a complaint by a tenant who had received a Notice of Rent Adjustment form after the rent increase went into effect.  <u>Id.</u> at ¶ 12.  The notice is dated November 25, 2003.  <u>Id.</u>  The tenant gave Ms. Sledge the envelope in which she had received the Notice, and the envelope was postmarked January 8, 2004.  <u>Id.</u>

Plaintiff admits that she received this write-up. (Pl. Dep. at 86:3-12.)  Plaintiff explains this write-up by saying that she was on leave, that Ms. Sledge did not send anyone to pick up her mail while she was on leave, and that the resident should have already known about the rent increase because it had been posted in accounting.  <u>Id.</u> at 89:12-19.  Residents are supposed to be notified of rent changes thirty days in advance. <u>Id.</u> at 89:20—90:3.  Although Plaintiff disputes the number of months of rent that the resident owed when she received the notice and does not

know if the envelope postmarked January 8, 2004, was the actual envelope used to mail the rent notice form to the resident, Plaintiff admits that the form should have been mailed on the date that she completed it. Id. at 92:14-20, 93:15-19, 94:3-7.   She does not deny mailing it late and even admits that it really should have been mailed to the resident on November 1st, but she claims the notice was mailed late because her workload was heavy and she could not get everything out in a timely manner.   Id. at 95:22—96:16; 96:21—97:6; 99:20-22.   In her deposition, Plaintiff stated that the notice was not mailed until January 2004 because she "had such a heavy workload, [she] basically just overlooked it." Id. at 100:14-18.

### B.    Second Write-Up/Suspension

In August 2004, Ms. Sledge counseled Ms. Manzy again for two other incidents.  (Sledge Aff. ¶ 13.)  One incident involved her failure to perform re-examinations of tenant files.  Id.  Re-examinations of a tenant's rent are done annually, and a tenant is to be notified at least thirty days prior to the effective date of a tenant's rent change.  Id.   A reexamination is done to make sure that the tenant is paying the appropriate amount of rent based on income.  (Pl. Dep. at 119:19-22.   Ms. Manzy notified Ms. Sledge on July 21, 2004, at 4:00 p.m., the day before she was taking a week's leave from work, that she had been unable to complete her tenant re-examinations.   (Sledge Aff. ¶ 13.)   While Ms. Manzy was on leave, Ms. Sledge and other employees had to complete approximately twenty-one files, send notices to the residents, and submit the changes to the Accounting Department.  Id.  These re-examinations files were for the month of August 2004, and the notices for these re-examinations should have been completed and sent to the residents by July 1, 2004.  Id.   For Ms. Manzy's failure to perform the re-

examinations in a timely manner, Ms. Sledge recommended that Ms. Manzy be suspended for three days without pay. Id.

Plaintiff admits that re-examinations are done monthly according to the tenant's anniversary date. (Pl. Dep. at 113:20—114:2.)  She explains this incident by stating that it was the same time that the HUD inspection and transfer to the Visual Home computer system were taking place.  Id. at 114:6-7.  On the last day of work before Plaintiff took leave, Plaintiff had to be in court for an eviction involving the MHA; later that day she received training for Visual Home.  Id. at 114:7-13, 21-23.  Plaintiff says she did not expect someone to come train her on Visual Home that day, so, having waited until the last day before she took leave to complete the re-examinations, she asked Ms. Sledge at 4:00 p.m. to send someone over to complete her work. Id. at 115:7-16.   Plaintiff blames Ms. Sledge for not having sent someone to finish Plaintiff's work and stated that if Ms. Sledge had sent someone the next day, the reexaminations would have been in accounting in time. Id. at 115:16-22.  Plaintiff does not recall the due date, or close-out date, for the re-examinations, but she thinks it would fallen while Plaintiff was on leave. Id. at 117:2-23.

The second incident included in the August 2004 write-up involved the inspection of a tenant's unit that had been damaged by water.  (Sledge Aff. ¶ 14.)  Ms. Manzy received a damage claim on June 18, 2004, but she did not sign and complete the claim form until July 12, 2004.  Id.  Ms. Manzy never inspected the tenant's unit for water damage.  Id.  Ms. Sledge recommended that Ms. Manzy be suspended for two days without pay for this violation.  Id.

Plaintiff explains this incident by stating that she had just returned from leave again. (Pl. Dep. at 104:4-7.)  She was in the middle of preparing for the HUD audit and transferring files to the new computer system.  Id. at 104:15-22.  Plaintiff first testified that the transferring of files to

the new computer system "had to be done almost like right away," that it was a "top priority, along with checking the folders for HUD, for the HUD inspection." Id. at 105:8-11. The Plaintiff told the resident of the water-damaged apartment that she would be "up in a second," to "hold on to everything," and she "would come up and look at it." Id. at 105:17-19. The Plaintiff claims that she then received a fax from Ms. Sledge asking her to do something else and, by the time she finished, the resident came and told her that she had thrown everything away. Id. at 106:6-12. Plaintiff admits that she never inspected the resident's apartment. Id. at 108:7-11. She admits that she did not complete a claim form until July 12, 2004, but she claims she was never given a time frame for turning in a claim form. Id. at 108:19—109:4. Plaintiff says she could not inspect the resident's unit because of the pressure she was under to complete the audit for HUD and for the Visual Home transfer, but she admits that she knew about the HUD audit a month in advance. Id. at 110:15-18, 112:18-21.

After the second write-up, Ms. Sledge and her assistant held a departmental disciplinary hearing with the Plaintiff to consider disciplinary action against the Plaintiff. (Sledge Aff. ¶ 15; Pl. Dep. at 126:7-11.) At the hearing, it was decided that Ms. Manzy would be suspended for five days, three for not completing the re-examinations and two for not inspected the unit for water damage. (Sledge Aff. at 15.)


### C.    Third Write-Up/Termination

After the second write-up, Ms. Sledge found other discrepancies in the Plaintiff's files. Id. at ¶ 16. Specifically, she found files where ceiling rents were being applied even though MHA had stopped applying ceiling rents in December 2003; inspections had not been completely processed; corrections from the previous year's HUD audit review had not been

made; charges to residents' accounts had not been applied; temporary rents had been set without following up to apply to correct rent; flat rents had been set instead of income-based rents; leases in the files were either missing or incomplete; changes had been reported by residents but there was no follow up, even though the information needed was in the file; and filing was left undone. Id.

Plaintiff remembers meeting with Ms. Sledge about these problems with her files. (Pl. Dep. at 127:22—128:6.) Plaintiff explained these problems by saying she had a heavy workload. Id. at 129:20—130:1. Plaintiff claims that, before she left for her suspension for the second write-up, she left notes on her files with instructions as to what needed to be done. Id. at 132:5-8.

Plaintiff admits that most of the violations found by Ms. Sledge were true. She disputes that the HUD corrections had been made, that some of her files had no leases, and that her filing was behind. Id. at 146:22—147:6, 155:1-7, 157:14—158:5. For the violations she admits, Plaintiff claims they were due to a heavy workload. Id. at 136:11-13. Specifically, Plaintiff admits that some of her move-out files were incomplete. Id. at 142:18-19. She admits that she had not completed some of the paperwork for the move-out inspections. Id. at 143:23—144:5. She admits that she may not have called in some of the inspection folders into maintenance because of her workload and because something else probably came up. Id. at 146:14-18. Plaintiff did not know what Ms. Sledge was referring to with respect to the charges not being posted to the tenant files, but she said that the charges were with the folder indicating that she was in the process of working on them. Id. at 148:18-23, 149:22—150:3, 151:8-16. Plaintiff cannot recall if she had applied temporary rents but said that, if she did, she had documented her file and was waiting for something to come in. Id. at 152:1-13. As for applying flat rents, the Plaintiff testified that she cannot recall when she was supposed to put a tenant on a flat rent but

that the MHA never provided her with the correct flat rent amounts. Id. at 153:1-7. Plaintiff admits that some of her files may have had ceiling rents applied to them. Id. at 155:17-19. She claims that Ms. Sledge did not inform her that the MHA was no longer going to use ceiling rents, but she has no knowledge about whether other managers were using them. Id. at 155:20—156:9.

Also, she thinks that other managers had problems with getting paperwork in on time because Ms. Sledge called and faxed all the managers asking them to get their rent changes in. Id. at 136:16—137:2. She also bases this on the fact that managers complained about their workloads during manager meetings. Id. at 161:19—162:7. The only two specific examples of this that Plaintiff could recall were when Deborah Reynolds and Lucy Pickett did not have their rent change forms in on time. Id. at 137:23—138:3. Plaintiff admits that both of these individuals are African-American and that they were not terminated. Id. at 138:4-9.


## IV.     The City Personnel Board Hearing

At the hearing before the City Board of Personnel, Ms. Sledge testified about the problems with Ms. Manzy's job performance (Sledge Aff. ¶ 17.) She also testified that none of the other housing community managers had problems completing their work like Ms. Manzy did. (Sledge Aff. ¶ 18.) Other managers made mistakes from time to time, but Ms. Manzy was the only manager who could not keep up with her workload to the degree described above. Id.

Ms. Sledge was under no duress to testify about these matters. Id. at ¶ 17. She did not testify out of fear of losing her job. Id. It was Ms. Sledge's opinion when recommending Ms. Manzy's termination and later when testifying before the City Personnel Board that Ms. Manzy had neglected her job duties and was incapable of performing the job duties required of a manager of MHA's housing communities. Id. Ms. Sledge's decision to recommend termination

of Ms. Manzy was not influenced by Mickey McInnish or any other employee of MHA.  Id. at ¶ 19.  The decision was based only on Ms. Manzy's failure to perform her duties as a manager. Id.

Plaintiff believes that Ms. Sledge did not want to write her up and that she was being told to write her up by Mr. McInnish.  (Pl. Dep. at 123:10-13.)  She claims that Mr. McInnish told Ms. Sledge to write up the Plaintiff due to Plaintiff's race, and she bases this on an alleged comment by Ms. Sledge to the Plaintiff, wherein Ms. Sledge told her that the resident's complaint about the late rent notice was not a "big deal" to Ms. Sledge but "Mickey told me to write you up."  Id. at 123:23—124:3.  She believes Mr. McInnish made her testify at the city personnel hearing, but she admits that the only evidence she has for this is "the one time she told me Mr. McInnish told her to write me up" for the rent change notice that was mailed late.  Id. at 162:13-23.  However, she admits that one of a manager's duties is to get rent change forms out, that they are expected to get them out timely, and that she did, in fact, mail the rent change form late. Id. at 163:1-15.  She simply claims that she should be excused from performing her duties because others had assistance with their work and she did not. Id. at 163:22—164:2.

After hearings before the administrative hearing officer and the City Personnel Board, rulings were issued in favor of MHA.  (Pl. Dep. at 184:20—185:3.)  Plaintiff does not feel that the hearing officers were racially motivated in their decisions; she believes they just believed what was reported to them. Id. at 185:4-11.

## V.    Plaintiff's Claims about the Alleged Discrimination

No one has ever told Plaintiff that she was terminated because of her race.  (Pl. Dep. at 53:9-12.)  Plaintiff bases this discrimination lawsuit only on her claim that she had a heavy

workload and that she asked for assistance but received none.  Id. at 43:13-23.  Plaintiff claims that white employees received assistance or a reduced workload when they asked for it. Id. at 43:18-23.  There is no other reason that Plaintiff believes she was discriminated against. Id. at 44:5-7.  She admits that she has no knowledge of a white employee who made the kind of mistakes she made but who did not get terminated. Id. at 166:13-16.  When asked if she knew of any such white employees, she stated, "I don't know about, you know, other people's work, but I'm sure they made errors."  Id. at 166:6-12.  Plaintiff also admits that she has no knowledge about the salaries of any of the white employees at MHA.  Id. at 198:7-13.  To the Plaintiff's knowledge, no one received any additional training to help them with the jobs that Plaintiff did not receive.  Id. at 200:8-12.  Finally, Plaintiff admits that her belief that white employees did not get written up is based on the "rumor mill."  Id. at 252:3-7.

Plaintiff testified that Mr. McInnish is the only person who discriminated against her on the basis of race.  Id. at 53:13-20.  Plaintiff believes that Mr. McInnish made the decision to terminate her because "he signed the papers."[1]  Id. at 54:15-17.  She states that Mickey McInnish treated her unfairly when compared to white employees and that he gave her a heavy workload. Id. at 44:15—45:3. Also, when Plaintiff's work was not "up to par or adequate, [she] received write-ups from [her] supervisor and her job was threatened."  Id. at 45:3-6.  Plaintiff states that her job was threatened by Ms. Sledge in that she was told if she could not produce, she would be dismissed. Id. at 45:10-17.  Plaintiff thinks that Mr. McInnish told Ms. Sledge to discipline or dismiss anyone who could not perform their job, and Plaintiff feels like this policy was implemented more harshly against her because she is black. Id. at 46:12-16, 20-22.  She admits

---

[1] Plaintiff testified later in her deposition, through questioning by her attorney, that she also feels like Lane Boggs, another MHA employee, discriminated against her because his signature was on her termination papers. (Pl. Dep. at 214-15.)  Mr. Boggs was originally sued by the Plaintiff in this lawsuit but was dismissed.

that she has no knowledge about how Mr. McInnish treated the other black managers.  Id. at 160:9-11.

She also stated that white employees were hostile and unfriendly to black employees, but the only example she could give of this was during a staff meeting, when she claims that Rudy Martinez, MHA's Personnel Manager, snapped at some employees.  Id. at 83:3-12, 84:7-13.

Finally, she complains that Ms. Sledge was constantly calling her office and constantly interrupting her work "by adding on other duties and still wanting the current work done."  Id. at 63:5-17.  Plaintiff does not know if Ms. Sledge called the other managers in a similar manner. Id. at 64:4-6.   Plaintiff does not think Ms. Sledge called the Plaintiff or interrupted her work because the Plaintiff is black, but she thinks Ms. Sledge was trying to intimidate her, frustrate her, and harass her by increasing her workload, probably because Ms. Sledge did not like Plaintiff. Id. at 64:7—65:8.  However, she does not feel that Ms. Sledge discriminated against her on the basis of race.  Id. at 53:21—54:5.


**VI.    The Housing Community Managers**

Of the eight housing community managers at MHA, seven are African-American and one manager, Diane Bishop, is white.  (Pl. Dep. at 47:12-22.)  In August 2004, Ms. Bishop was the only Caucasian employed as a housing community manager; the other seven housing community managers were black females.  (Martinez Aff. ¶ 8.)  The same is true today. Id.

Plaintiff has no personal knowledge about any other African-American managers who were terminated by the MHA for conduct similar to hers.  Id. at 48:18—49:1.  She knows of one other African-American manager, Maggie Gardner, who is no longer working at the MHA, but she admits that she does not know the "specifics" or the "details of her case." Id. at 48:20—49:1.

She does not know if Ms. Gardner was fired, forced to resign, or if she just left.  Id. at 140:12-13,
141:5-8.  In short, the Plaintiff does not know why Ms. Gardner is no longer working there.  Id.
at 49:8-10.   To the Plaintiff's knowledge, she is the only African-American manager who was
terminated for making the kind of mistakes she made. Id. at 141:9-18.

When asked if she knew of any other African-American housing community managers
who were treated more harshly than white employees, she stated that she felt like all the black
housing community managers were treated more harshly.  Id. at 49:11-23.  She basis this on her
belief that Diane Bishop, the white housing community manager, had fewer units than any of the
other housing community managers and Ms. Bishop's community "probably wasn't as
complicated as [Plaintiff's] was. Id. at 50:5-6, 65:18—66:9.   Other than Ms. Bishop having
fewer units in a housing community that "probably wasn't as complicated," Plaintiff cannot
name any way in which a white housing community manager was treated differently than the
Plaintiff.  Id. at 66:10-14.


## VII.    Non-Housing Community Managers and Employees

In addition to the housing community managers discussed above, in August 2004 MHA
had the following management-level employees:   five African-American males, four white
males, one Hispanic male, six African-American females, and four white females.  (Martinez
Aff. ¶ 9.)  Plaintiff claims that some of these white employees at the main office received
assistance with their workload while the black housing community managers did not. (Pl. Dep. at
50:6-9.)   Specifically, Plaintiff named DeAnn Smith in accounting, Jill West in public relations,
and Wendy Cochran in the Section 8 Housing Department.   (Pl. Dep. at 50:13-18, 51:3-5;
Martinez Aff. ¶ 10.)  Plaintiff also named Kerry Revell, the community worker who worked with

Plaintiff at Patterson Court, as a white employee who received better treatment. (Pl. Dep. at 66:20—68:13.)

### A.    DeAnn Smith

Plaintiff claims Ms. Smith was treated better because she was given assistance when she complained of her workload.  <u>Id.</u> at 73:5-8.  However, Plaintiff has no personal knowledge that Ms. Smith ever complained about her workload or asked for help; Plaintiff simply saw a memo stating that a new person would be assisting Ms. Smith. <u>Id.</u> at 74:14-19.  Other than the fact that Ms. Smith handled accounts for the housing communities, the Plaintiff has no knowledge of Ms. Smith's workload.  <u>Id.</u> at 75:4-8.  Plaintiff has never worked with Ms. Smith, has never worked in the accounting department, and has no knowledge about how much work Ms. Smith has to do on a daily basis.  <u>Id.</u> at 75:9-15; 81:4-5.

In fact, DeAnn Smith was the account clerk in the accounting department. (Martinez Aff. ¶ 12.)  She was not a management-level employee and did not have an assistant.  <u>Id.</u>  Ms. Smith at one time was responsible for doing the posting and receiving of rental receipts.  <u>Id.</u>  However, MHA's auditors suggested that MHA hire or reassign a new employee to do the posting of rental receipts because doing both the posting and receiving of rental receipts was not an accepted internal control.  <u>Id.</u>  For this reason, the posting duties were separated from Ms. Smith's job and a new employee was hired to do the posting duties.  <u>Id.</u>

### B.    Jill West

With respect to Jill West, Plaintiff's stated that the "[o]nly thing I see her doing was putting out a quarterly newsletter" and speaking to the media.  (Pl. Dep. at 75:16-23, 77:2-9.) Plaintiff admits that she never worked in the public relations department.  <u>Id.</u> at 77:10-12; 81:6-7. Plaintiff does not know if Ms. West ever asked for any type of assistance, but she says that Mr.

McInnish stated in a board meeting once that Ms. West needed some help with her workload. Id. at 76:8-23. Jill West was the Public Information Officer at MHA until she resigned in 2005. (Martinez Aff. ¶ 11.) She has not been replaced. Id. She was not a management-level employee. Id. The only assistance Ms. West had with her job was two interns. Id. One intern was a student from Auburn University at Montgomery, and one was a student from Alabama State University. Id. They did very little administrative work for Ms. West. Id. They mostly wrote articles for MHA's newsletter. Id. The interns were not employees of MHA and received no pay from MHA. Id.

### C.    Wendy Cochran

Wendy Cochran was MHA's Section 8 Housing Director until May 29, 2004, when she resigned. (Martinez Aff. ¶ 10.) Ms. Cochran was replaced by Cathy Harris, a black female. Id. Plaintiff's complaint about Wendy Cochran is that she was given latitude in her job by being allowed to come into work late so she could be with her family. (Pl. Dep. at 77:16—78:4.) Plaintiff learned about Wendy being allowed to come in late when she asked Ms. Sledge for time off to take the bar exam. Id. at 78:21—79:6. Although Plaintiff claims that Ms. Cochran's being allowed to come in late is an example of being treated better than the Plaintiff, Plaintiff admits that she was allowed to take her requested time off. Id. at 79:12-23. With respect to any assistance that Ms. Cochran had, new employees are added as the Section 8 Department grows. (Martinez Aff. ¶ 10.) HUD issues vouchers to MHA, and MHA issues them to participants in the Section 8 program. Id. As HUD issues more vouchers, the program grows and additional employees are added to the Section 8 Department. Id. The more vouchers MHA receives, the more employees it needs to work in the Section 8 Department. Id.

**D.    Kerry Revell**

Plaintiff complains that Kerry Revell, the community worker assigned to help the Plaintiff at Paterson Court, was treated differently as well.  (Pl. Dep. at 66:20—68:13.)  Plaintiff claims Ms. Revell was treated better in that she asked Mr. McInnish if she could work at only one community instead of two, and she was then allowed to work at Paterson Court only.  Id. at 71:11—72:2.   In other words, she was taken away from Ms. Bishop, the white housing community manager, and assigned to Paterson Court only.

Kerry Revell was not a management-level employee.  (Martinez Aff. ¶ 13.)  Ms. Revell was originally hired to work at only one housing community.  Id.  When one of the other community workers left, Mr. Revell took over a second housing community because budget cuts prevented MHA from immediately replacing the community worker who had left.  Id.  When MHA later hired another community worker, Ms. Revell went back to being a community worker for only one housing community. Id.

Other than the white employees described above, Plaintiff can think of no other white employees who were treated differently than Plaintiff, and Ms. Bishop is the only one of these employees who was a housing community manager. Id. at 80:13-23.  Plaintiff admits that she has no knowledge of how the workloads of Jill West, DeAnn Smith, or Wendy Cochran compared to hers.  Id. at 171:17-21.   When asked if the Plaintiff knew anything about their workloads as compared to hers, she stated, "I don't think that matters. I don't think that matters.  It matters that I had an excessive workload; they had an excessive workload; they were given help; I was not." Id. at 169:15-21.  Plaintiff testified that the fact that she made so many mistakes was evidence that she needed assistance as much as anyone else.  Id. at 170:8-19.

## SUMMARY JUDGMENT STANDARD

Rule 56 (c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate where "there is no genuine issue as to any material fact and … the moving party is entitled to a judgment as a matter of law."  Once the party seeking summary judgment has informed the court of its basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553, 91 L. Ed. 2d 265 (1986); see also Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115-17 (11 Cir. 1993) (describing the responsibilities of the summary judgment movant and non-movant as dependent upon the locus of the burden of proof at trial). In making its determination, the court must view all evidence and any factual inferences in the light most favorable to the non-moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct.  1348, 1356, 89 L. Ed. 2d 538 (1986).

## ARGUMENT

Plaintiff alleges in this lawsuit that MHA provided better working conditions to white employees and applied its disciplinary policies more harshly to her because of her race, resulting in her termination for a failure to perform her job adequately.  Specifically, Count One states that MHA discriminated against Ms. Manzy under the color of law on the basis of race and denied her equal protection of the law.  Count Two alleges that MHA deprived Ms. Manzy of her 14th Amendment rights in violation of § 1981, and Count Three alleges that MHA under the color of law deprived Ms. Manzy of her 14th Amendment rights under § 1983.   MHA is entitled to summary judgment on all of Plaintiff's claims.

Plaintiff has no direct evidence of discrimination.  No one has ever told Plaintiff that she was terminated because of her race.  (Pl. Dep. at 53:9-12.)   Plaintiff bases her claim of discrimination on the fact that she had no assistant to help her with her workload.  (Pl. Dep. 43:13-23.)  Thus, her § 1981 and § 1983 are analyzed under the same framework as Title VII's burden shifting framework.  Turnes v. AmSouth Bank, N.A., 36 F.3d 1057, 1060 (11th Cir. 1994). (using the McDonnell Douglas scheme for § 1981 discrimination claim in an employment case); Sasser v. Alabama Dept. of Corrections, 373 F. Supp. 2d 1276, 1291 (M.D. Ala. 2005) (stating that when a 1983 claim is used as a parallel remedy for violation Title VII, the elements of the two causes of action are the same).

Under the McDonnell Douglas framework, a plaintiff has the initial burden of establishing a prima facie case of unlawful race discrimination by a preponderance of the evidence. Id. at 1284.  A prima facie case requires "evidence adequate to create an inference that an employment decision was based on a[n] [illegal] discriminatory criterion." Id. (quoting International Broth. of Teamsters v. United States, 431 U.S. 324, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).  If the plaintiff establishes a prima facie case of racial discrimination, the burden then shifts to the employer to rebut the presumption by articulating legitimate, non-discriminatory reasons for its employment action. Id. (citing Holifield v. Reno, 115 F.3d 1555, 1564 (11th Cir. 1997)).  This intermediate burden is exceedingly light. Id.  The employer has the burden of production, not of persuasion, and thus does not have to persuade a court that it was actually motivated by the reason advanced. Id. at 1284-85 (citing McDonnell Douglas at 411 U.S. at 802, 93 S.Ct. 1817 and Texas Dep't of Comty. Affairs v. Burdine, 450 U.S. 248, 253-55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).

Once the employer satisfies this burden of production, the presumption of discrimination is eliminated and the plaintiff must present evidence sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision. Id. Establishing a prima facie case does not in itself entitle a plaintiff to survive a motion for summary judgment. Id. After an employer proffers non-discriminatory reasons for its actions, a plaintiff must produce sufficient evidence for a reasonable fact-finder to conclude that the employer's proffered reason is pretextual. in order to survive summary judgment. Id.

I.    **MHA is entitled to summary judgment because Plaintiff cannot establish a prima facie case.**

The Eleventh Circuit has explained that, for the usual disparate treatment case where direct evidence is not present, "a plaintiff establishes a prima facie case of race discrimination by showing: (1) she belongs to a racial minority; (2) she was subjected to adverse job action; (3) her employer treated similarly situated employees outside her classification more favorably; and (4) she was qualified to do the job. Id. MHA does not concede that Plaintiff can establish any elements of her claim, but, for purposes of summary judgment, it is clear that Plaintiff cannot establish the third element of her claim.

Plaintiff's racial discrimination claim is based on her contention that white employees received assistance with their workloads. (Pl. Dep. at 43:18-23.) There is no other reason that Plaintiff believes she was discriminated against. Id. at 44:5-7. She alleges that providing white employees were greater assistance caused her termination. (Compl. ¶ 7.)

To establish a prima facie case, Plaintiff must present evidence of a similarly situated white employee who was treated more favorably. To determine whether employees are similarly

situated for purposes of establishing a prima facie case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir. 2001). The primary factors to consider in the disciplinary context include the nature of the offenses committed and the nature of the punishments imposed. Id.    In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order "to prevent courts from second-guessing employers' reasonable decisions and confusing apples with oranges." Id. (citations omitted).  To meet the comparability requirement, a plaintiff must show that he is similarly situated in all relevant aspects to the non-minority employee. Id..  In other words, a plaintiff must be "matched with a person or persons who have very similar job-related characteristics and who are in a similar situation" to the plaintiff. MacPherson v. University of Montevallo, 922 F.2d 766, 774 at n.16 (11th Cir. 1991).

Of all the white employees to whom Plaintiff compares herself, only Diane Bishop can be considered a similarly situated employee.  She was a housing community manager, so her job responsibilities were virtually identical to the Plaintiff's.  However, Plaintiff has no evidence that Diane Bishop committed the same types of violations as Plaintiff without receiving write-ups or other disciplinary action.  Plaintiff claims that Ms. Bishop was treated better because Ms. Bishop had fewer housing units to manage and that Ms. Bishop's community "probably wasn't as complicated as [Plaintiff's] was." (Pl. Dep. at 50:5-6, 65:18—66:9.)   Plaintiff insists that other housing community managers had problems getting paperwork in on time, but the only specific examples of managers not submitting their paperwork on time that Plaintiff could recall were when Deborah Reynolds and Lucy Pickett did not have their rent change forms in on time. Id. at 137:23—138:3.  Plaintiff admits that both of these individuals are African-American and that

they were not terminated. Id. at 138:4-9. Plaintiff cannot name any other white housing community managers who were treated differently than the Plaintiff. Id. at 66:10-14.

Plaintiff attempts to compare herself to Wendy Cochran, Jill West, DeAnn Smith, and Kerry Revell.  Plaintiff has no evidence concerning possible policy violations by these employees or disciplinary action taken against these employees.  Plaintiff's complaint is that they received assistance with the workloads but Plaintiff did not.  None of these employees can be considered similarly situated employees.  None of these employees managed housing communities, so their job responsibilities were different from Plaintiff's.  Wendy Cochran was MHA's Section 8 Housing Director; Jill West was the Public Information Officer; DeAnn Smith was the account clerk in the accounting department; and Kerry Revell was a community worker at the Paterson Court, the community that Plaintiff managed.  Moreover, of these four employees, only Wendy Cochran was a management-level employee.  None of these employees "have very similar job-related characteristics and who are in a similar situation" to the Plaintiff. MacPherson, 922 F.2d at 774.

Even if these employees could be considered similarly situated employees, Plaintiff admits that she has no knowledge about these employees' workloads or how their workloads compared to hers and, in fact, believes that such a comparison does not matter. (Pl. Dep. at 169:15-21, 171:17-21.)  All of her complaints about these employees are based on her own speculation.

With respect to Ms. Smith, Plaintiff thinks she was given someone to help her when she complained about her workload, but she has no personal knowledge that Ms. Smith ever complained or asked for help; Plaintiff simply saw a memo stating that a new person would be assisting Ms. Smith.  Plaintiff has never worked with Ms. Smith, has never worked in the

accounting department, and has no knowledge about how much work Ms. Smith has to do on a daily basis. The fact is that Ms. Smith did not have an assistant to help with her workload. A new employee was assigned to do the posting of rental receipts, a duty previously done by Ms. Smith, after MHA's auditors suggested that having Ms. Smith do both the posting and the receiving of rental receipts was not an accepted internal control.

Similarly, Plaintiff's claims about Ms. West are unsubstantiated. Plaintiff never worked in the public relations department and does not know if Ms. West ever asked for any type of assistance. All she knows is that Mr. McInnish stated in a board meeting once that Ms. West needed some help. The only assistance Ms. West had with her job included two student interns who primarily wrote articles for MHA's newsletter and were not paid by MHA.

As for Wendy Cochran, Plaintiff's complaint is that she was given latitude in her job by being allowed to come into work late so she could be with her family, but the Plaintiff admits that she was also given time off to study for the bar exam when she asked for it. As for any assistance Ms. Cochran may have had, new employees are added to the Section 8 department as the Section 8 program grows. The more vouchers MHA receives from HUD, the more employees it needs to manage the program.

Finally, Plaintiff's complaints about Kerry Revell are also unsubstantiated. Plaintiff claims Ms. Revell was treated better because she asked Mr. McInnish if she could work at only one community instead of two, and she was then allowed to work at Paterson Court only. Plaintiff overlooks the fact that Ms. Revell was taken away from Ms. Bishop, the white housing community manager, and assigned to work with the Plaintiff only. Furthermore, Ms. Revell was originally hired to work at only one housing community. She began working at a second community when one of the other community workers left. When MHA later hired another

community worker, Ms. Revell went back to being a community worker for only one housing community.

Other than the white employees described above, Plaintiff could name no other white employees who were treated differently than Plaintiff, and Ms. Bishop is the only one of these employees who was a housing community manager. Id. at 80:13-23.   Without a proper comparator, Plaintiff cannot establish a prima facie case of disparate treatment, and MHA is entitled to summary judgment. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997).


**II.     Even if Plaintiff could establish a prima facie case, MHA is entitled to summary judgment because Plaintiff cannot establish that MHA's articulated reason for her termination was pretextual.**

Even if the Plaintiff could establish a prima face case of race discrimination, MHA is still entitled to summary judgment because Plaintiff cannot establish that MHA's articulated reason for her termination is pretextual.   MHA has satisfied its burden of articulating a legitimate, nondiscriminatory reason for Plaintiff's termination.   As stated above, MHA's burden at this stage is "exceedingly light" and is a burden of production, not persuasion. Sasser, 373 F. Supp. 2d at 1284.  MHA has met this burden.  MHA has produced evidence of Plaintiff's first write-up for not mailing a tenant's rent change notice on time, evidence of Plaintiff's second write-up for the incidents involving the water-damaged apartment and the re-examinations that were not performed, and evidence that Plaintiff found numerous other problems with Plaintiff's file during the time that Plaintiff was on leave.

Once an employer satisfies its burden of production, the presumption of discrimination is eliminated, and the plaintiff must produce evidence sufficient to permit a reasonable fact-finder to conclude that the reasons given by the employer were not the real reasons for the adverse

employment decision.'" <u>Id.</u> at 1285.  Plaintiff cannot do this.  Although Plaintiff claims that her workload prevented her from mailing the rent change notice on time, she admits that she mailed it in January and that it should have been mailed the previous November.  Plaintiff admits that she did not inspect the water-damaged apartment, that she did not complete the claim form for the water-damaged apartment for almost one month, that she did not complete the re-examinations before taking leave, that re-examinations are done monthly according to a tenant's anniversary date, that she did not notify her supervisor until 4:00 p.m. before she took leave that the re-examinations were incomplete, and that her supervisor and other employees had to complete the re-examinations while she was on leave.  Finally, although she disputes some of the other violations that Ms. Sledge found with her files, she admits to the majority of them.  Thus, Plaintiff cannot establish that MHA's reason for terminating Plaintiff is pretext.

**III.    MHA is also entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff has no evidence of the alleged unlawful policy of MHA.**

Finally, MHA is entitled to summary judgment on Plaintiff's § 1983 claim because Plaintiff has no evidence of the alleged policy of giving white employees greater latitude.  The United States Supreme Court has held that counties (and other local government entities) are "persons" within the scope of § 1983 and subject to liability, but a plaintiff cannot rely on a theory of *respondeat superior* to hold the entity liable liable. <u>McDowell v. Brown</u>, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing <u>Monell v. Dept. of Soc. Servs.</u>, 436 U.S. 658, 692, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) (finding that § 1983 "cannot be easily read to impose liability vicariously on governing bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor")).

To impose § 1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation. Id. A plaintiff seeking to hold a municipality liable under § 1983 must identify a municipal policy or custom that caused the plaintiff's injury. Id. at 1290. A custom is defined as "a practice that is so settled and permanent that it takes on the force of the law." Id. (citations omitted). In order for a plaintiff to demonstrate a policy or custom, it is necessary to show a "persistent and wide-spread practice." Id.

In the Complaint, Plaintiff identifies MHA's policy as one "where black employees are more likely to be disciplined or terminated than white employees for the same infractions…." (Compl. ¶ 7.) She also claims that the "policy standard as imposed and enforced against black employees is not the same policy standard that is enforced and imposed against white employees." However, Plaintiff cannot present any evidence of such a policy. She admits that she has no personal knowledge of any other African-American managers who were terminated by the MHA for conduct similar to hers. She knows of one other African-American manager, Maggie Gardner, who is no longer working at the MHA, but she admits that she does not know the details about Ms. Gardner's situation. She does not know if Ms. Gardner was fired, forced to resign, or if she just left. Plaintiff has no evidence to support the allegation in her Complaint that African-American employees were more likely than white employees to be disciplined or terminated. To the Plaintiff's knowledge, she is the only African-American manager who was terminated for making the kind of mistakes she made. Plaintiff simply has no evidence of a persistent and wide-spread practice that caused her alleged injury. McDowell, 392 F.3d at 1290. Therefore, MHA cannot be held liable for Plaintiff's § 1983 claim.

## CONCLUSION

For the reasons stated above, MHA respectfully requests this Court to enter summary judgment in its favor on all of Plaintiff's claims against it.

Respectfully submitted,

s/ Angela R. Rogers
Charles A. Stewart III (STE067)
Angela R. Rogers (RAI017)
Bradley Arant Rose & White LLP
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
Email: cstewart@bradleyarant.com
Email: arogers@bradleyarant.com

**Attorneys for Defendant Montgomery Housing Authority**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 29, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Norman Hurst, Jr., Esq.
> 462-A Sayre Street
> Montgomery, AL  36104

and I hereby certify that I have mailed by United States Postal Service the document to the following non-CM/ECF participants: not applicable.

s/ Angela R. Rogers
Angela R. Rogers (RAI017)
Bradley Arant Rose & White LLP
The Alabama Center for Commerce
401 Adams Avenue, Suite 780
Montgomery, AL 36104
Telephone: (334) 956-7700
Facsimile: (334) 956-7701
E-mail: arogers@bradleyarant.com
